658 F.2d 1372
 26 Empl. Prac. Dec. P 32,096, 2 A.D. Cases 11
 Joshua R. PUSHKIN, M. D., Plaintiff-Appellee,
v.
The REGENTS OF the UNIVERSITY OF COLORADO; the University of
Colorado; the University of Colorado Hospital, a/k/a the
University of Colorado Health Sciences Center; University of
Colorado Psychiatric Hospital; and Douglas Carter, M. D.,
Defendants-Appellants.
 No. 81-1224.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted July 17, 1981.
Decided Sept. 4, 1981.
 
 George D. Dikeou, Asst. Atty. Gen., Denver, Colo. (J. D. Macfarlane, Atty. Gen., Denver, Colo., with him on the brief), for defendants-appellants.
 David E. Engdahl, Engdahl & Renzo, Denver, Colo., for plaintiff-appellee.
 Before DOYLE and LOGAN, Circuit Judges, and TEMPLAR,* Senior District Judge.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 This is an appeal by the defendants-appellants consisting of the Regents of the University of Colorado; the University of Colorado Hospital, also known as University of Colorado Health Science Center; the University of Colorado Psychiatric Hospital; and Douglas Carter, M. D. The action was brought by Joshua R. Pushkin, M. D., the plaintiff-appellee in this court, pursuant to § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and 42 U.S.C. § 1983.
 
 
 2
 The decree in question is an injunction directing that plaintiff-appellee be admitted to the next class at the University of Colorado Psychiatric Residency Program; the judgment awarded plaintiff attorneys fees and costs. The plaintiff had sought monetary damages as well. This request has been denied and no appeal is taken from this denial.
 
 
 3
 Dr. Pushkin is a medical doctor who alleges that the University of Colorado wrongfully denied him admittance to the Psychiatric Residency Program because he suffers from multiple sclerosis. As a result of this disease Dr. Pushkin is confined to a wheelchair, and is disabled in his abilities to walk and to write. The court found that Dr. Pushkin was an otherwise qualified handicapped individual who had been excluded from a program receiving federal financial assistance solely by reason of his handicap, and that the University was in violation of § 504 of the Rehabilitation Act which provides in pertinent part:
 
 
 4
 No otherwise qualified handicapped individual in the United States as defined in § 706(6) of this Title, shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance...
 
 
 5
 It is undisputed that the program in question is receiving federal financial assistance. The district court, 504 F.Supp. 1292, recognized this and further ruled that the statute was violated because the plaintiff was excluded from participation in or denied the benefits of or subjected to discrimination under a program receiving such funds within the meaning of the statute. The court also held that Dr. Pushkin was an otherwise qualified individual in spite of his handicap, in accord with the Supreme Court's ruling in Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), and thus was entitled to admittance to the program. Pursuant to the injunction, Dr. Pushkin was admitted to the residency program on July 1, 1981 and he is actually taking part in the program at the present time. We have expedited the appeal in an effort to reach an early resolution of the controversy. As already noted defendants have not disputed that Dr. Pushkin is handicapped within the meaning of the statute, that the Psychiatric Residency Program is a program or activity receiving federal financial assistance within the meaning of the statute and that defendants were acting under color of state law within the meaning of § 1983 in taking the position which they took.
 
 
 6
 Defendants appeal the trial court's ruling on three grounds. They maintain that: 1) no private cause of action exists under § 504; 2) plaintiff has failed to exhaust his administrative remedies prior to filing this lawsuit; and 3) the trial court erroneously decided the merits of the case. Each of these contentions will be taken up in this review.
 
 
 7
 DOES § 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794 CREATE
 
 
 8
 A PRIVATE CAUSE OF ACTION?
 
 
 9
 The Supreme Court's decision in Southeastern Community College v. Davis, 442 U.S. 397, 404, n. 5, 99 S.Ct. 2361, 2366, n. 5, 60 L.Ed.2d 980 (1979) considered a case which arose under this identical section but did not consider the issue of a private remedy under the Act. The Court did rule on the merits of the case and the judgment of the Court of Appeals for the Fourth Circuit which had granted relief to the handicapped person was reversed by the Supreme Court. The decision was based on the "otherwise qualified" phrase in the statute. It rejected the requirement that was imposed by the court of appeals that § 504 contemplated "affirmative conduct" by the College to modify its program to accommodate the disabilities of applicants. The Supreme Court's determination was that there was no violation of the statute and the Supreme Court's unanimous decision said "in light of our disposition of this case on the merits, it is unnecessary to address these issues (including whether a private right of action was provided by the Act) and we express no views on them." 442 U.S. 405, n. 5, 99 S.Ct. 2366, n. 5.
 
 
 10
 This court in Coleman v. Darden, 595 F.2d 533 (10th Cir.), cert. denied, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979), recognized that a private right of action may have been created by § 504. Every court of appeals and district court, and there have been many, which have considered this question have held that a private right of action exists under the statute. See, e. g., Kling v. County of Los Angeles, 633 F.2d 876 (9th Cir. 1980); Camenisch v. University of Texas, 616 F.2d 127 (5th Cir. 1980), vacated on other grounds, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); Rogers v. Frito Lay, Inc., 611 F.2d 1074 (5th Cir.), cert. denied, Moon v. Roadway Express, Inc., 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980); N. A. A. C. P. v. The Medical Center, Inc., 599 F.2d 1247 (3rd Cir. 1979); Southeastern Community College v. Davis, 574 F.2d 1158 (4th Cir. 1978), rev'd. on other grounds, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); Leary v. Crapsey, 566 F.2d 863 (2nd Cir. 1977); United Handicapped Federation v. Andre, 558 F.2d 413 (8th Cir. 1977); Kampmeier v. Nyquist, 553 F.2d 296 (2nd Cir. 1977); Lloyd v. Regional Transportation Authority, 548 F.2d 1277 (7th Cir. 1977);[1] Cain v. Archdiocese of Kansas City, 508 F.Supp. 1021 (D.Kan.1981); Coleman v. Casey Cty. Bd. of Ed., 510 F.Supp. 301 (W.D.Ky.1980); Patton v. Dumpson, 498 F.Supp. 933 (S.D.N.Y.1980); Miener v. State of Missouri, 498 F.Supp. 944 (E.D.Mo.1980); Simon v. St. Louis County, Mo., 497 F.Supp. 141 (E.D.Mo.1980); Guertin v. Hackerman, 496 F.Supp. 593 (S.D.Tex.1980); Larry P. v. Riles, 495 F.Supp. 926 (N.D.Cal.1979); Poole v. South Plainfield Bd. of Ed., 490 F.Supp. 948 (D.N.J.1980); Upshur v. Love, 474 F.Supp. 332 (N.D.Cal.1979); Cruz v. Collazo, 84 F.R.D. 307 (D.Puerto Rico 1979); Boxall v. Sequoia Union High School District, 464 F.Supp. 1104 (N.D.Cal.1979); Howard S. v. Friendswood Independent School District, 454 F.Supp. 634 (S.D.Tex.1978); Davis v. Bucher, 451 F.Supp. 791 (E.D.Pa.1978); Michigan Paralyzed Veterans of America v. Coleman, 451 F.Supp. 7 (E.D.Mich.1977); Halderman v. Pennhurst State School and Hospital, 446 F.Supp. 1295 (E.D.Pa.1977), aff'd. in part, rev'd. in part, 612 F.2d 84 (3rd Cir. 1979), rev'd. on other grounds, --- U.S. ----, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); Crawford v. Univ. of North Carolina, 440 F.Supp. 1047 (M.D.N.C.1977); Barnes v. Converse College, 436 F.Supp. 635 (D.S.C.1977).[2] It is noteworthy that the Supreme Court in Campbell v. Kruse, et al, 434 U.S. 808, 98 S.Ct. 38, 54 L.Ed.2d 65 (1977) suggested that a private right of action does exist under § 504 when it remanded the case to the district court to determine whether handicapped children were being discriminated against by the application of the tuition grant system in question under § 504 rather than under the Fourteenth Amendment equal protection principles.
 
 
 11
 Such a finding is fully supported by the legislative history of § 504 which provides as follows:
 
 
 12
 This approach to implementation of section 504, which closely follows the models of the above-cited anti-discrimination provisions (§ 601 of the Civil Rights Act of 1964, 42 U.S.C. 2000d-1, relating to race, color or national origin; § 901 of the Education Amendments of 1972, 42 U.S.C. 1683, relating to sex) would ensure administrative due process (right to hearing, right to review), provide for administrative consistency within the federal government as well as relative ease of implementation, and permit a judicial remedy through a private action.
 
 
 13
 S.Rep.No. 93-1297, 93 Cong. 2d Sess. 39-40, reprinted in 4 U.S.Code Cong. and Admin.News, pp. 6373, 6391 (1974) (emphasis supplied).
 
 
 14
 The Supreme Court's opinion in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) contains a test for determining whether a private right of action may be implied in a statute which does not expressly provide for such a right. That test requires that the following questions be answered:
 
 
 15
 First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted' that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law?
 
 
 16
 Id. at 78, 95 S.Ct. at 2088 (citations omitted). We agree with the above cited decisions that the requirements of the Cort test are fully satisfied when considered in relation to § 504.
 
 
 17
 The defendants-appellants rely on Pennhurst State School and Hospital v. Halderman, --- U.S. ----, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), for the proposition that no private right of action should be found to exist in § 504 actions. But in that case the Supreme Court considered a different Act, § 6010 of the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6001, et seq., (the "Assistance Act"). This provision was determined to not create a private right of action. Section 6010 was found to have been enacted solely pursuant to the spending power of Congress and not pursuant to Congress' power under § 5 of the Fourteenth Amendment. The opinion stated that the remedy for state non-compliance with federally imposed conditions in legislation enacted pursuant to the spending power is action by the federal government to terminate funds to the state, and not action by private citizens. The Court interpreted § 6010, which provides that persons with developmental disabilities have a right to appropriate treatment, services and rehabilitation appropriate to their needs, but did not suggest that compliance with that section was a condition for the recipient of federal funding under the Act. An additional observation was that the explicit purpose of § 6010 was to assist the states, through the use of federal grants, to improve the care and treatment of the mentally disabled, and not to require the states to fund new, substantive rights. The Court stated that the "provisions of § 6010 were intended to be hortatory, not mandatory." 101 S.Ct. at 1543. Therefore, the Court declined to imply a private cause of action under § 6010 of the Assistance Act.
 
 
 18
 Pennhurst is not applicable to the present issue concerning § 504 of the Rehabilitation Act inasmuch as the history of § 504 expressly indicates that the anti-discrimination provision of the statute is a mandatory prohibition against discrimination on the basis of handicap. The report of the Senate Labor and Public Welfare Committee which is within the legislative history of the Rehabilitation Act Amendment of 1974 states that "section 504 is intended to include a requirement of affirmative action as well as a prohibition against discrimination." 4 U.S.Code Cong. and Admin.News, p. 6390 (1974). The report further states:
 
 
 19
 Section 504 was patterned after and is almost identical to the anti-discrimination language of section 601 of the Civil Rights Act of 1964, 42 U.S.C. 2000d-1 (relating to race, color, or national origin), and section 901 of the Education Amendments of 1972, 42 U.S.C. 1683 (relating to sex). The section therefore constitutes the establishment of a broad government policy that programs receiving Federal financial assistance shall be operated without discrimination on the basis of handicap. It does not specifically require the issuance of regulations or expressly provide for enforcement procedures, but it is clearly mandatory in form, and such regulations and enforcement are intended.
 
 
 20
 Id. (emphasis supplied).
 
 
 21
 In addition the report states that sanctions for non-compliance with the Act "would include, where appropriate, the termination of federal financial assistance to the recipient or other means authorized by law." Id. (emphasis supplied). As previously noted the report expressly states that § 504 "permit(s) a judicial remedy through a private action."
 
 Id. at 6391 (emphasis supplied).[3]
 
 22
 In Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) the Supreme Court ruled that since Title IX of the Civil Rights Act was patterned after Title VI of that Act, and Title VI creates an implied private right of action for discrimination, Title IX should also be read to imply a private right of action. This reasoning applies with reference to § 504 of the Rehabilitation Act, which was also patterned after Title VI of the Civil Rights Act. Section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Section 901(a) of Title IX of the Education Amendments of 1972, §§ 901-903, are virtually the same as § 504 of the Rehabilitation Act, 29 U.S.C. § 794. Section 601 is framed the same way except that it refers to race, color or national origin. Section 901(a) has the same qualities, although it refers to discrimination based on sex as its object whereas in § 504 the reference is to otherwise qualified handicapped individuals. In Cannon, the Supreme Court expressly rejected the court of appeals' reasoning that since § 902 of Title IX established a procedure for the termination of federal financial support for institutions violating § 901, that Congress intended that remedy to be the exclusive means of enforcing the statute. The Court recognized that Title IX and Title VI sought to accomplish two purposes: "to avoid the use of federal resources to support discriminatory practices," and "to provide individual citizens effective protection against those practices." 441 U.S. at 704, 99 S.Ct. at 1961. The Court held that a private right of action was necessary to promote the second of those purposes. For the same reasons, § 504, expressly based on and modeled after Title VI of the Civil Rights Act and Title IX of the Education Amendment, must also be read to imply a private right of action if individual handicapped persons are to have effective protection against prohibited discriminatory practices. Moreover, the Court in Cannon rejected the defendant's argument that a private cause of action should not be implied when the result would be "to subject admissions decisions of universities to judicial scrutiny at the behest of disappointed applicants on a case by case basis." Id. at 709, 99 S.Ct. at 1964.
 
 
 23
 If one compares Cannon with Pennhurst, it becomes apparent that the Cannon principles apply with regard to § 504, while the principles of Pennhurst do not. Section 504 of the Rehabilitation Act, Title VI of the Civil Rights Act, and Title IX of the Education Amendments were all created to provide mandatory substantive rights to private citizens subject to discrimination on the basis of race, color, national origin, sex or handicap. In order to enforce those rights Congress has prohibited the use of federal resources to support discriminatory practices, and has provided individual citizens with private remedies to overcome the discrimination. Unlike § 6010 of the Assistance Act, § 504 of the Rehabilitation Act was not enacted merely to assist the states in implementing policies to prevent discrimination generally, but to mandatorily prohibit discrimination on the basis of handicap. Under § 504 of the Rehabilitation Act, as well as under Title VI of the Civil Rights Act and Title IX of the Education Amendments, compliance with the non-discrimination mandate is a condition to federal funding. This makes some difference. These statutes create substantive rights in the classes of persons they are geared to protect. Such a class has enough interest to justify an action on its behalf.
 
 
 24
 But the above is not all. The explicit language evidencing congressional intent that § 504 created a private right of action indicates that such a cause is to be implied under § 504 on the basis of a clear congressional intent, as well as on the basis of the factors which are set forth in Cort and Cannon.
 
 
 25
 Justice Powell, in his dissenting opinion in Cannon, raised a question as to the validity of following the four pronged test of Cort v. Ash when determining whether a private right of action exists under every federal statute. Justice Powell was concerned that the Cort analysis has been used to deflect the inquiry away from the intent of Congress. With regard to § 504, however, such is not the case. Implying a private right of action under § 504 is fully in accord with the express congressional intent in enacting § 504.
 
 
 26
 The trial court ruled that it had jurisdiction to hear this claim under Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), since the action was brought pursuant to § 504 and 42 U.S.C. § 1983. It found that under Thiboutot, § 1983 gives a cause of action for violation of federal rights under both the Constitution and federal statutes. The defendants disagree on the ground that in order for a § 1983 claim to be predicated upon an alleged violation of a statute, that statute must confer a federal substantive right upon the plaintiff. Defendants contend that § 504 merely provides a remedial right, and not a substantive right. This issue need not be decided, however, in view of our conclusion that § 504 provides an individual remedy. We hold that a private right of action does exist under § 504 of the Rehabilitation Act.
 
 
 27
 IS IT NECESSARY FOR THE PLAINTIFF IN THIS CAUSE TO EXHAUST
 
 
 28
 OTHER REMEDIES?
 
 
 29
 The remedy to which the defendants refer is that contained in regulations promulgated by the Department of Health and Human Services (HHS, formerly the Department of Health, Education and Welfare), 45 C.F.R. § 84, et seq. Under those regulations HHS may require the recipient of federal funding to take such remedial action as HHS deems necessary to overcome the effects of unlawful discrimination. 45 C.F.R. § 84.6(a)(1) and (2). Pursuant to § 84.6(a)(3), HHS may take such action with regard to handicapped persons who would have been able to participate in the program in question but for the discrimination of the recipient of federal assistance. It is the position of defendants-appellants that plaintiff was required to pursue the above mentioned remedies prior to initiating this lawsuit. We disagree. In the first place it is not within the plaintiff's power to pursue the remedy since it is a public one and not a private remedy.
 
 
 30
 29 U.S.C. § 794a(a)(2) provides that the procedures set forth for enforcement of Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d et seq. shall be available for enforcement of the Rehabilitation Act. Under 42 U.S.C. § 2000d-1, an administrative examination of the practices of a recipient of federal assistance may lead to a suspension or termination of the federal assistance; such relief, however, does not include or encompass equitable relief for the affected individual. Similarly, under 45 C.F.R. § 84, et seq., the regulations permitting HHS termination of federal funding do not provide a means by which an individual can obtain personal redress for a violation of § 504. See, Whitaker v. Board of Education, 461 F.Supp. 99 (E.D.N.Y.1978). This would be an empty remedy indeed for the plaintiff herein who was seeking to continue his residency program. In other words he would make no progress in this endeavor by seeking to compel the cutting off of funds generally to the university.
 
 
 31
 In Camenisch v. University of Texas, supra, the Fifth Circuit discussed the exhaustion question at some length. That court based its decision that exhaustion was not required under § 504 on Cannon v. University of Chicago, supra, wherein the Supreme Court upheld the right to a private cause of action under Title IX of the Rehabilitation Amendments without resort to administrative mechanisms. Inasmuch as the same administrative and enforcement procedures are to be followed with respect to both Title IX and § 504 (45 C.F.R. § 84.61 and § 86.71 (1979)), the Fifth Circuit has held that private suits to enforce a cause of action under § 504 should also be allowed without resort to these administrative procedures. The Fifth Circuit stated:
 
 
 32
 In Cannon, the Supreme Court said that the complaint procedures adopted by HEW did not allow the complainant to participate in the administrative investigation or subsequent enforcement proceedings. If a violation was found, a resulting compliance agreement might not include relief for the complainant. Furthermore, the Court found that the ultimate remedy, a complete cut-off of federal funds to the institution was an inappropriate result for an individual complainant. 99 S.Ct. at 1962-63, n.41.
 
 
 33
 616 F.2d at 135. The Fifth Circuit ruled that the same conclusion should be reached under § 504 as was reached under Title IX. The Fifth Circuit stated that the administrative remedy that emerges from a hearing process is not designed to aid such petitioners at all and that such a decision terminating funding of a violating recipient would work to the disadvantage of a complainant since such a cut-off could guarantee that no further services accrue to the complaining party. The court went on to say that there existed no specific vindication of personal rights within the HEW administrative procedure which would operate for the benefit of the complaining party. The court added that the appellees had filed an affidavit of the Director of the Division of Policy and Procedure in the Office of Civil Rights in HEW, which said that it is an OCR policy that § 504 complainants should be allowed to file civil actions in the federal courts without exhausting either the grievance procedures established by a recipient or HEW's own complaint procedure. The court stated that "it makes good sense and was the congressional intent that § 504 rights be protected by grant termination through the administrative process or by private suits to eliminate the proscribed discrimination." 616 F.2d at 136.
 
 
 34
 Kling v. County of Los Angeles, supra, 633 F.2d at 879, is a case in which the Ninth Circuit relied on Cannon in reaching the same result. See also, Swan v. Stoneman, 635 F.2d 97 (2nd Cir. 1980); Cain v. Archdiocese of Kansas City, Kansas, 508 F.Supp. 1021 (D.Kan.1981); Larry P. v. Riles, 495 F.Supp. 926 (N.D.Cal.1979); Sherry v. N. Y. State Ed. Dept., 479 F.Supp. 1328 (W.D.N.Y.1979); Cruz v. Collazo, 84 F.R.D. 307 (D.Puerto Rico 1979). Without question Cannon is dispositive of this issue. We hold that under § 504 of the Rehabilitation Act the plaintiff is not compelled to pursue a remedy which is irrelevant to his particular need.
 
 
 35
 One additional factor should be mentioned, however, and that is that § 1983 has also been cited as a basis for the lawsuit. Regardless of the reach of Maine v. Thiboutot, supra, actions pursuant to § 1983 are definitely recognized under statutes conferring substantive rights. It is plain that § 504 does confer substantive rights upon handicapped people in that Congress contemplated a private right of action to enforce mandatory anti-discriminatory provisions. Thus, under any reading of Thiboutot, plaintiff's cause of action is properly based on § 1983 and no requirement exists that administrative remedies be exhausted prior to court action under § 1983. Under both § 504 and § 1983, then, plaintiff is not required to exhaust remedies as a prerequisite to filing this suit.
 
 
 36
 SUMMARY OF THE TRIAL COURT'S FINDINGS.
 
 
 37
 The memorandum opinion of the trial court included far reaching and extensive findings of fact. The essence of the court's ruling was that the judge had weighed all of the defendants' allegations at trial that Dr. Pushkin was not qualified for the program apart from his handicap and found that the evidence intended to show that the plaintiff was rejected as being unqualified due to his handicap was more persuasive. The testimony of the University's own witnesses was conflicting, and the after the fact allegations given at trial that Dr. Pushkin was not of the caliber of applicants usually interviewed for the residency program are not supported by the record, including the interviewers' reports. Also they are contrary to comments made by the Chairman, Dr. Carter, to both Dr. and Mrs. Pushkin concerning the reasons for Dr. Pushkin's rejection, which emphasized the fact of the handicap. The trial court specifically noted:
 
 
 38
 What is clear, however, is that when informing Dr. Pushkin of his rejection, Dr. Carter discussed the rejection only in terms of the handicap and gave no other reason; that when subsequently discussing the rejection with Dr. Pushkin's wife Dr. Carter again explained the decision only in terms of Dr. Pushkin's handicap; and that the interviewers' reports document assumptions of inability based upon the handicap.
 
 
 39
 The trial court further stated that its conclusions that the reason for plaintiff's exclusion from the program was his handicap were based on:
 
 
 40
 The interview sheets which refer to assumed disabilities occasioned by his multiple sclerosis ... and additional testimony which shows after the fact articulation of concern about his alleged emotional instability which was not manifested in the interview sheets or in Dr. Carter's conversations with Dr. and Mrs. Pushkin.
 
 
 41
 The trial court weighed the credibility of the conflicting evidence and rejected the after the fact testimony that Dr. Pushkin was not qualified for the program apart from his handicap. This evidence of non-qualification came to the surface, of course, after the interviews. The record supports the findings that the trial court made that the reason for rejecting Dr. Pushkin was entirely his affliction. Having found that Dr. Pushkin was rejected from the residency program on the basis that his multiple sclerosis would preclude him from performing well in the duties of the program, the trial court applied the proper test in determining whether defendants' articulated reasons for finding Dr. Pushkin unqualified in spite of his handicap were legitimate, or whether those reasons were based upon incorrect assumptions or inadequate factual grounds. In any event, after weighing all of the evidence the trial court held that the latter was applicable, that is that the reasons were based on incorrect assumptions or inadequate factual grounds. Since the decision so reached is supported by the record, this court is not at liberty to reach an independent factual conclusion and determine otherwise. We do however consider further the applicable test or standard.
 
 
 42
 WHAT IS THE PROPER STANDARD OF REVIEW?
 
 
 43
 It is contended by the defendants-appellants that their decision not to admit Dr. Pushkin to the residency program must be reviewed under equal protection standards, and necessarily must be affirmed under the rational basis test. Principally, the University contends that in cases not involving a suspect class, fundamental rights, an irrebuttable presumption, or a federal statute establishing different legal standards than that enunciated by a public body, judicial deference to administrative decision, especially academic decisions relating to admissions criteria, must be followed whenever the decision of the public body is rationally related to legitimate governmental needs. In other words they say that the rational basis test of equal protection must be applied when considering § 504.[4] The rational basis test is not applicable where there is an alleged violation of a statute, § 504, which prohibits discrimination on the basis of handicap. That statute by its very terms does not provide that a recipient of federal financial assistance may act in an unreasonable manner to promote legitimate government means, even if discrimination should be the result. Rather, the statute provides that a recipient of federal financial assistance may not discriminate on the basis of handicap, regardless of whether there is a rational basis for so discriminating. The inquiry has to be on whether the University has, in fact, discriminated on the basis of handicap. The mere fact that the University acted in a rational manner is no defense to an act of discrimination. Thus, while application of the rational basis test may be used to lend credence to the proposition that no discriminatory action has been taken, a finding of rational behavior on the part of the University is only the start of our search to determine whether the mandate of § 504 has been followed.
 
 
 44
 The Supreme Court apparently considered the issue of whether the analysis should be under the equal protection clause or whether it should be a cause arising under § 504 in Campbell v. Kruse, supra. In that appeal from the District Court for the Eastern District of Virginia the judgment was vacated and the case was remanded to the United States District Court for the Eastern District of Virginia with directions to decide the claim based on the federal statute, § 504 of the Rehabilitation Act of 1973. In Kruse the plaintiffs had brought an action pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794, the Social Security Act, 42 U.S.C. § 601, et seq., and the First, Ninth and Fourteenth Amendments to the Constitution, alleging the invalidity of a Virginia statute supposedly denying handicapped children of poor parents the ability to obtain an appropriate education. The district court analyzed the case on constitutional grounds, stating that "the fundamental constitutional question is whether the denial of full tuition under ... (the statute) violates the right of handicapped children to the equal protection of the laws." 431 F.Supp. 180, 186 (E.D.Va.1977). The court concluded that the law did violate equal protection principles. In the memorandum opinion referred to immediately above, the Supreme Court remanded the cause to the district court with directions to decide the issue in accord with § 504, thereby implying that a different analysis applies with regard to § 504 than with regard to constitutional claims. 434 U.S. 808, 98 S.Ct. 38, 54 L.Ed.2d 65 (1977).
 
 
 45
 The standards for determining the merits of a case under § 504 are contained in the statute. First, the statute provides that the individual in question must be an "otherwise qualified handicapped individual;" second, the statute provides that a qualified handicapped individual may not be denied admission to any program or activity or denied the benefits of any program or activity receiving federal financial assistance "solely" on the basis of handicap. To ask the court to defer to admissions decisions of a recipient of federal financial assistance whenever such a decision is rationally related to legitimate government needs is to ask the court to ignore the plain statutory language of § 504. To approach § 504 in such a manner, that is by applying the rational basis test, would be to reduce that statute to nothingness, which should always be avoided.
 
 
 46
 In Cannon v. University of Chicago, supra, the Supreme Court rejected the argument that admissions decisions of universities should not be subjected to judicial scrutiny. 441 U.S. at 709-710, 99 S.Ct. at 1963-1964. To limit judicial scrutiny of university admissions decisions solely to the rational basis test where § 504 is involved would be to ignore the standards set forth in § 504 and would eliminate judicial scrutiny altogether under the statute. It is, of course, understandable why the University seeks such a soft test. We conclude that the University is not entitled to ignore the statute and focus on equal protection principles, and to have us adopt, in addition, the least demanding of the equal protection tests; one which is at odds with § 504.
 
 
 47
 The University's argument that discrimination may not be found under § 504 in the absence of recognized discriminatory intent also fails. Also maintained by the University, et al, is that since the trial court found that the defendants did not act in bad faith, discriminatory intent was necessarily not present; thus, as proof of discriminatory intent is necessary to establish an equal protection violation under Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the plaintiff herein, carrying the argument a step further, may not prevail. This ignores again the fact that the plaintiff's claim is based on the statute, namely § 504, a claim which must stand or fall according to the principles enunciated in that statute. Plaintiff's claim is not a general equal protection claim, and is not to be caught in the machinery which surrounds the equal protection clause, which clause is applied when courts are scrutinizing claims having to do with invidious discriminatory intent.
 
 
 48
 A further argument of the appellants is that the test established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), for determining whether an individual has been subjected to "disparate treatment" because of his protected status should be applied with respect to § 504 claims. Under a "disparate treatment" analysis, plaintiff would have to establish a prima facie case by showing that he belongs to a protected class, that he was qualified for the position sought, and that he was rejected under circumstances giving rise to an inference of unlawful discrimination, in that his rejection was more likely than not based on consideration of impermissible factors. Texas Department of Community Affairs v. Burdine, supra. The burden then shifts to the defendant to articulate legitimate, nondiscriminatory reasons for the rejection. Plaintiff must then meet his burden of showing that the reasons articulated were a mere pretext for discrimination.
 
 
 49
 The University contends that while Dr. Pushkin established a prima facie case of discrimination, this was rebutted when the University articulated nondiscriminatory reasons for Dr. Pushkin's rejection. They say that Dr. Pushkin did not meet his burden of showing that the reasons articulated by the University were pretextual. Further, the University maintains that under a "disparate treatment" analysis it must be shown that the University's decision was motivated by intentional discrimination, and since the trial court has held that the University acted in good faith, no discriminatory purpose was found. The disparate treatment analysis is inapplicable to a claim under § 504. Defendants are creating a straw man and thereafter destroying it. It would be a rare case indeed in which a hostile discriminatory purpose or subjective intent to discriminate solely on the basis of handicap could be shown. Discrimination on the basis of handicap usually results from more invidious causative elements and often occurs under the guise of extending a helping hand or a mistaken, restrictive belief as to the limitations of handicapped persons. A claim under § 504 would be analyzed more readily under a "disparate impact" theory where it is claimed that a facially neutral practice has a discriminatory impact on persons within a protected class. See, Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). However, the statute itself does not contemplate either a disparate treatment or a disparate impact analysis.
 
 
 50
 We repeat what we said before and that is that § 504 sets forth its own criteria for scrutinizing claims under that statute. First, the individual is required to show that he is otherwise qualified for the position sought; second, the individual must show that even though he is otherwise qualified, he was rejected for the position solely on the basis of his handicap. The two factors are interrelated, since if the individual is not otherwise qualified he cannot be said to have been rejected solely because of his handicap.
 
 
 51
 In Southeastern Community College v. Davis, supra, the Supreme Court considered the express statutory language of § 504 to solve the problem. Under Davis the first test applied was whether the individual in question was qualified for the position sought in spite of his handicap. If the plaintiff's handicap would preclude him from doing the job in question, the plaintiff cannot be found to be otherwise qualified. If the handicap would not preclude the individual from performing the job in question, however, and the plaintiff has met all other qualifications for the position in question, the plaintiff cannot be rejected from the program solely on the basis of his handicap. The record is clear that Dr. Pushkin established that he had the necessary ability despite his handicap. The examining committee, however, focused on the handicap continuously in connection with determining whether to admit him to the residency program. It emphasized factors such as the effect of the handicap on patients and the resulting effect on Dr. Pushkin. Thus, the issue is not merely whether the handicap played a prominent part in his rejection, as in cases dealing with alleged discrimination on the basis of race, for example (where race is never expressly mentioned as a consideration), the issue is whether rejecting Dr. Pushkin after expressly weighing the implication of his handicap was justified. The question is whether Dr. Pushkin was qualified for admission to the residency program in spite of his handicap, so that he was wrongfully rejected from the program on the basis of that handicap, or whether Dr. Pushkin's handicap would preclude him from carrying out the responsibilities involved in the residency program and future patient care, so that the University rightfully excluded him from the program after weighing the implications of his disability.
 
 
 52
 The trial judge quotes in his findings that an interrogatory was submitted by counsel for Dr. Pushkin requesting the defendants to state every reason why the application of plaintiff for the position of psychiatric resident in any defendant institution was rejected and every reason why he was not appointed to said position. The response to that interrogatory was "the plaintiff was not admitted into the 'psychiatric resident, R II program,' because plaintiff's interview mean ratings, based upon plaintiff's four interviews with faculty members of the University of Colorado Psychiatric Hospital, was far below the level of any other person accepted into the program."
 
 
 53
 The trial court's findings go on to say that the mean interview ratings as a general practice are not necessarily controlling in the selection process. Moreover, in a specific reference to Dr. Pushkin, Dr. Carter stated that "the numbers," i. e. the mean interview ratings, did not dispose of his application. Dr. Pushkin was never told that his mean interview rating was the reason for his rejection. However, even if the mean interview ratings were the reason for his rejection, that is like saying that he was rejected because he was rejected. In other words the interrogatories should have detailed his insufficiencies in specific terms at the very least. The court also found that the
 
 
 54
 narrative contained on each interviewer's report, explains the reasons for the rating on the prediction scale. Each instance shows that the interviewer's rating was inextricably involved with Dr. Pushkin's handicap and by the interviewer's perception of the problems the handicap would create. It is not possible to extricate ratings from the reactions to the handicap itself.
 
 
 55
 The court finally noted that neither Pushkin nor his wife were ever given a reason for his rejection from the program other than that specified by Dr. Carter that Pushkin was rejected because of his handicap. They were left to draw inferences in their conversations with Dr. Carter and the only inference to be drawn by each from the statements made and the absence of other statements being made was that the handicap itself was the reason for the rejection.
 
 
 56
 The record is replete with testimony dealing with the inability of Dr. Pushkin to serve in the residency program based upon his handicap. These observations of the members of the panel are not predicated on any known deficiency of Dr. Pushkin himself, but rather these are reasons that are based upon the examiners' general knowledge of multiple sclerosis and their concern for psychologic reactions of the patient and in turn the doctor, as a result of his being in a wheelchair. The trial court concluded that the evidence in the case clearly established that these general reasons did not apply with regard to Dr. Pushkin, but that Dr. Pushkin was an otherwise qualified handicapped individual who was wrongfully, by sole reason of his handicap, excluded from participation in or denied the benefits of or subjected to discrimination under a program or activity receiving federal financial assistance.
 
 
 57
 It would be neither correct nor right, under the circumstances presented, to analyze this case in accord with a strict disparate treatment test as the same was used in McDonnell Douglas Corp. v. Green, supra. Instead, our approach to the case is fully in harmony with the statute, § 504, as the same has been construed by the Supreme Court in Southeastern Community College v. Davis, supra. We believe that the appropriate standards to be gleaned from the court's opinion are the following:1) The plaintiff must establish a prima facie case by showing that he was an otherwise qualified handicapped person apart from his handicap, and was rejected under circumstances which gave rise to the inference that his rejection was based solely on his handicap;
 
 
 58
 2) Once plaintiff establishes his prima facie case, defendants have the burden of going forward and proving that plaintiff was not an otherwise qualified handicapped person, that is one who is able to meet all of the program's requirements in spite of his handicap, or that his rejection from the program was for reasons other than his handicap;
 
 
 59
 3) The plaintiff then has the burden of going forward with rebuttal evidence showing that the defendants' reasons for rejecting the plaintiff are based on misconceptions or unfounded factual conclusions, and that reasons articulated for the rejection other than the handicap encompass unjustified consideration of the handicap itself.
 
 THE FINAL ANALYSIS
 
 60
 Unquestionably plaintiff has established a prima facie case by showing that he is a handicapped person who is qualified for the residency program apart from his handicap and that he was rejected from the program under circumstances which support a finding that his rejection was based solely on his handicap. As to his qualifications, plaintiff met the requisite academic standards of the program in that he held an M.D. degree and had obtained a satisfactory "dean's letter." Plaintiff also presented a letter from Dr. Wong, his supervisor during one year of residency in psychiatry at the Menninger Foundation in Topeka, Kansas. In this letter Dr. Wong stated:
 
 
 61
 Doctor Pushkin is a hard-working, thorough, reliable and efficient physician, showing remarkable patience and perserverence and more than the average understanding for his patients. His supervisors did not feel that his medical illness presented any emotional impairment in his work in the field of psychiatry and felt that he had great potential for a future in psychiatry. He has a pleasing personality, works well with his colleagues and is able to handle the most difficult case in a satisfactory manner. He was an inspiration to his colleagues, to faculty and staff.
 
 
 62
 Furthermore, plaintiff had been practicing medicine with an emphasis on psychiatry at the time that he applied for the program in question.
 
 
 63
 The position of the University is that Dr. Pushkin was denied admittance to the residency program on the basis of the interview reports of four members of the program faculty: Drs. Carter, Weissberg, Scully and Barchilon. Dr. Pushkin's mean interview ratings, when computed by scores granted by the four interviewers, were held to be too low. In addition to the grades given by the interviewers each made comments expressing their views about Pushkin's capabilities. Dr. Carter stated that Dr. Pushkin "is teachable, but to face the devastation, guilt, pity and rage that can be stirred up in his patients by his physical condition appears to be too much to ask of his patients or of him."
 
 
 64
 Dr. Weissberg's report noted that while Dr. Pushkin is bright and has terrific drive, that it was doubtful that Dr. Pushkin would be able to work full time.
 
 
 65
 Dr. Scully's report noted that Pushkin had multiple sclerosis with significant physical defects, that prognosis is unclear, and that Dr. Pushkin has a lot of anger due to his multiple sclerosis that he is "either unaware of or cannot deal with at this time." Dr. Scully stated in his report that Dr. Pushkin is "able to talk about how his illness might be an issue in psychotherapy," that the effect on his classmates is unclear, and that, clearly, Dr. Pushkin "is a risk."
 
 
 66
 Dr. Barchilon's report indicates concern that the emotional stress of treating patients may be too much for Dr. Pushkin, and that he might not be able to stand the stress and strain of on call duty due to his disease.
 
 
 67
 With the possible exception of Dr. Weissberg, all of the reports appear to focus on his handicap. At trial, as will appear below, the interviewers testified that Dr. Pushkin's physical limitations were not the reason he was not accepted into the program, but they indicated that Dr. Pushkin's mental status, as interrelated with his MS, was a controlling factor in that decision. Unquestionably the evidence was sufficient to establish a prima facie case of a violation of § 504.
 
 
 68
 We next consider the reasons articulated by the University at trial for the plaintiff's rejection.
 
 
 69
 Dr. Barchilon testified that he viewed Pushkin as an ill person, rather than a handicapped one, since a handicapped person is "stabilized" in that his defect is predictable and can be accounted for, while a sick person is not stabilized. Dr. Pushkin was said by him to be ill, barely in equilibrium, and taking large doses of Prednisone which leads to unpredictable results because of its accumulative effect. Side effects cited by Dr. Barchilon were said to be highs and lows of emotions and outbursts of anger, both of which symptoms Dr. Barchilon claimed to have observed in Dr. Pushkin. Dr. Barchilon felt that Dr. Pushkin had emotional problems from which he was unable to achieve enough distance to enable him to empathize with his patients and their problems. Dr. Barchilon seemed equally concerned with the effect on Dr. Pushkin if he were accepted in the program (i. e., that Dr. Pushkin's work would make him unhappy) as with the effect of Dr. Pushkin's treatment on the patients.
 
 
 70
 Dr. Carter's testimony was that Dr. Pushkin "elicits strong feelings in people. Whether it's pity, whether it's concern, whether it's 'My God, I'm glad it's not me,' it stirs up a lot of things and it seems very clear that many things would be stirred up in his patients with that problem." Dr. Carter also testified that he was not sure that Dr. Pushkin could handle either the emotional strain of caring for the patients, or the physical load. He added that he was not Dr. Pushkin's psychiatrist, "but I had a sense that he is very angry underneath."
 
 
 71
 Dr. Weissberg's testimony was that "as a regular person Dr. Pushkin was doing fine," in that "he used a fair amount of pushing away of feelings" about his illness, but that this "would not have been appropriate in a psychiatrist."
 
 
 72
 Dr. Scully testified that the issue was not the wheelchair, "the issue is what does the MS mean?" Dr. Scully testified that Dr. Pushkin was very angry. He also testified that he and Dr. Pushkin talked about how patients might react to his illness.
 
 
 73
 Dr. Bernstein, head of the psychiatric liaison division of the Department of Psychiatry at the University Medical School, who participated in a post-interview conference about Dr. Pushkin, testified that he and Dr. Scully discussed the latter's observations of Dr. Pushkin. Dr. Bernstein said that Dr. Scully felt that he could "never meet Dr. Pushkin head on," and that "there was some organicity here that impaired Dr. Pushkin being able to engage with him." He said that he and Dr. Scully discussed the fact that when a person has MS "there is some difficulty in mentation. There is some delirium," and that the fact that Dr. Pushkin was on steroids could "very seriously disturb (his) sensorium," that is, difficulty in orientation, judgment and memory. Dr. Bernstein stated that Dr. Scully felt that Pushkin exhibited problems in both areas. He also testified that in his own mind the determinative factor for Pushkin's rejection was the latter's difficulties in mentation, delirium and disturbed sensorium. He stated that from what Dr. Scully and Weissberg had told him, he felt that Dr. Pushkin "has not worked his own condition through to the extent that he can be open and receptive, not only to his patients' reactions to him, but to whatever their own problems are ...."
 
 
 74
 The Pushkins, husband and wife, testified as to what Dr. Carter had told them, which was that Dr. Pushkin had been rejected from the program because of his handicap. According to Dr. and Mrs. Pushkin, Dr. Carter had told them that Pushkin's multiple sclerosis would prevent him from relating well with his patients, and would prevent the patients from relating well to Dr. Pushkin. Mrs. Pushkin also stated that Dr. Carter had told her that Dr. Pushkin might miss work due to hospitalization for his illness, and that would leave his patients without a doctor. Regarding this, both Doctor and Mrs. Pushkin testified that Dr. Pushkin's multiple sclerosis allowed his episodes of hospitalization to be planned in advance, similar to the way vacations were planned in advance by other doctors, and that Dr. Pushkin had always arranged for other doctors to care for his patients when he was hospitalized, just as most doctors arrange for others to care for their patients when they are on vacation. Dr. and Mrs. Pushkin further noted that Dr. Pushkin did not tell his patients he would be hospitalized, any more than other doctors told their patients where they were going on vacation, so that the patients would not be unduly burdened by such information.
 
 
 75
 There was testimony also from Dr. Gordon Farley, Dr. Pushkin's psychiatrist and a psychiatrist at the University of Colorado Health Center. Dr. Farley expressed anxiety about being subpoenaed as a witness since his patient was suing his employer. He was apprehensive about testifying in opposition to his employers. Also to be noted is that Dr. Farley participates as an interviewer of potential residents at the University of Colorado, but that he was not one of Dr. Pushkin's interviewers. Farley testified that Dr. Pushkin's emotional responses were "within the range of normal," and that from Dr. Pushkin's discussions of his work with his patients, Dr. Pushkin had "treated those patients appropriately," "has had good emotional accessibility" to his patients, and has "reasonably well understood their feelings toward him." Dr. Farley said that Dr. Pushkin is "quick mentally," that he "exercises good judgment in his care of patients," and that he is a "responsible, reasonable, reasoned and conscientious physician." Dr. Farley said that Dr. Pushkin's mentation had not been affected by either the medications that he was taking or by the disease itself. He testified that having observed Dr. Pushkin for four years he had never observed any delirium in him, any disabled sensorium, or any noticeable effect from either the steroids or from the disease. Dr. Farley further testified that Dr. Pushkin "does as well as he can with his illness as any human being could," and that he is "well within the norm of emotional control and behavior." According to Dr. Farley, Dr. Pushkin would make an "exceptional" psychiatrist.
 
 
 76
 The reports of the interviewers and the testimony of the other witnesses indicates that on the basis of 45 minute interviews and discussions by some of the interviewers with Dr. Bernstein, the admissions committee made certain assumptions regarding his handicap, such as:
 
 
 77
 1) That Dr. Pushkin was angry and so emotionally upset due to his MS that he would be unable to do an effective job as a psychiatrist; and
 
 
 78
 2) That Dr. Pushkin's MS and use of steroids had led to difficulties with mentation, delirium and disturbed sensorium; and
 
 
 79
 3) That Dr. Pushkin would be unable to handle the work involved in the residency because of his MS; and
 
 
 80
 4) That Dr. Pushkin would miss too much time away from his patients whereby they would suffer.
 
 
 81
 The testimony of the Pushkins and Dr. Farley and the letter from Dr. Wong rebut all these assumptions. Dr. Farley, who actually counseled Dr. Pushkin, and has done so for over a long period of time and was not merely reaching conclusions on the basis of his observations in the interview, stated that after four years of observing Pushkin closely he could not agree that any of the assumptions made by the admissions committee regarding MS applied to Dr. Pushkin.
 
 
 82
 It is within the power of the trier of the facts, here the trial court, to weigh the evidence and to determine the credibility of the witnesses. The trial judge found that the assumptions made by the admissions committee were rebutted by other evidence, and thus Dr. Pushkin could not be held to be unqualified due to his handicap. When the trial court's decision is supported by substantial evidence in the record, we are not free to reverse that decision. It boils down to that factor. We fully understand also why the trial court would find that the evidence on behalf of Pushkin was the more persuasive. In short, in the absence of a clearly erroneous decision by the trial court, this court is not going to substitute its judgment for that of the trial court. Quarles v. Fuqua Industries, Inc., 504 F.2d 1358 (10th Cir. 1974).
 
 
 83
 It is argued that the judgment of Dr. Farley may not be used as a substitute for the judgment of the admissions committee, who are solely responsible for admissions decisions. We do not disagree with this but feel that the defendants' argument misses the point. The trial court did not substitute Dr. Farley's judgment for that of the admissions committee. That witness was offered to rebut the University's articulated reasons for maintaining that Dr. Pushkin was not qualified for the program despite his handicap. The witnesses on behalf of the University, and the reports of the interviewers, alleged that Dr. Pushkin's handicap would preclude him from doing a good job as a psychiatrist. Thus Dr. Farley was offered as a witness to show that, after four years of observing Dr. Pushkin, he believed the University's assumptions to be based on incorrect factual premises. We see no more effective way for Dr. Pushkin to rebut the University's assumptions or unduly restrictive beliefs as to Dr. Pushkin's capabilities when considered in relation to multiple sclerosis. To preclude this kind of evidence would be to preclude individual plaintiffs from ever rebutting the reasons articulated by a defendant for the actions which it has taken. Indeed it would preclude relief under § 504.
 
 
 84
 An attempt was made by some of the interviewers to say that Dr. Pushkin was not rejected solely because of his handicap, but that he would have been rejected anyway even if he had not been handicapped. The trial court found that this evidence was overshadowed by the contrary evidence, including the interviewers reports, showing that Pushkin was rejected from the residency program solely on the basis of his handicap. The record fully supports the trial court's decision that their conclusions at the interview were centered on the multiple sclerosis. It was only when the interviews reached the trial stage that they sought to expand their reasoning.
 
 
 85
 Dr. Barchilon testified that Dr. Pushkin was not of the caliber of people usually interviewed for the residency program and that Dr. Pushkin overidentified with his patients. However, Dr. Barchilon testified that he had not communicated any of those thoughts to any of the committee members prior to the time the decision to reject Dr. Pushkin was made. That doctor further testified that on the basis of such a brief interview of Dr. Pushkin, his assessment was merely an "educated guess." Furthermore, Dr. Barchilon indicated that he was irritated with the procedure which was followed with regard to Dr. Pushkin's application.[5]
 
 
 86
 Dr. Scully also stated at trial that Dr. Pushkin was not of the caliber of residents usually admitted to the program. This is in conflict with the testimony of Dr. Bernstein, who indicated that Dr. Scully was primarily concerned with the fact that Dr. Pushkin had MS. Moreover, Dr. Scully's testimony indicated uncertainty as to factors other than MS causing Dr. Pushkin's rejection, since he stated further that he thought Dr. Pushkin "had more issues going on than his MS or whatever; I wasn't quite sure."In addition, Dr. Weissberg stated that Dr. Pushkin was not up to the usual quality of applicants to the program. He also stated, however, that he had not made that observation in his interview report.
 
 
 87
 As noted before, however, the trial court weighed the credibility of the conflicting evidence and rejected the after the fact testimony that Dr. Pushkin was not qualified for the program apart from his handicap. We are disinclined to substitute our judgment for that of the trial court, since that court's conclusion is supported by the record. We have evaluated the evidence and considered the findings and have approved the trial court's action. The conclusions of the examining board rest on psychologic theory. Our reaction is that these are weak and inadequate threads where, as here, the entire future of the plaintiff is at stake. We also hold that he applied the proper tests in determining whether defendants' articulated reasons for finding Dr. Pushkin unqualified on the basis of his handicap were legitimate or whether those reasons were based upon incorrect assumptions or inadequate factual grounds. Based upon the weighing of all the evidence the trial court held that the latter applied and since the decision is supported by the record, this court cannot reach its own factual conclusion and determine otherwise.
 
 
 88
 Viewing the record as a whole we conclude that the judgment of the district court is affirmed.
 
 
 
 *
 Honorable George Templar, United States Senior District Judge, sitting by designation
 
 
 [1]
 Lloyd was decided prior to promulgation of the regulations enacted pursuant to § 504. In Simpson v. Reynolds Metals Co., Inc., 629 F.2d 1226, 1230, n. 7 (7th Cir. 1980), the Seventh Circuit left open the question of whether, after promulgation of those regulations, a private right of action should be implied. The court indicated that it would follow the reasoning of Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), where the Supreme Court held that a private right of action exists under Title IX of the Education Amendment. The Seventh Circuit stated:
 Given the similarity of the Title V, Title VI, and Title IX enforcement procedures, we believe these same concerns over the absence of an effective administrative enforcement scheme would also apply to complaints under § 504 challenging discrimination in programs funded by HEW or the VA.
 
 
 [2]
 We are solely concerned in the case at bar with whether § 504 provides a private right of action for equitable relief, and have cited the above cases for that proposition alone. There is a split of authority as to whether a private right of action is available under § 504 for damages. Compare, e. g., Patton v. Dumpson, 498 F.Supp. 933 (S.D.N.Y.1980), with Miener v. State of Missouri, 498 F.Supp. 944 (E.D.Mo.1980)
 
 
 [3]
 This statement was made in a report concerning the 1974 Amendments to the Rehabilitation Act. We recognize that in Southeastern Community College v. Davis, supra, 442 U.S. at 411, n.11, 99 S.Ct. at 2370, n.11, the Supreme Court noted that comments made after the enactment of a statute "cannot substitute for a clear expression of legislative intent at the time of enactment." In Davis, however, the issue concerning which that statement was made involved the extent of affirmative action required by § 504, as stated in the regulations promulgated pursuant to that statute. The court indicated that since HEW had been ordered to promulgate those regulations, the deference normally given to agency interpretation of a statute is diminished, and since the subsequent declaration of congressional intent regarding the regulations was not subsequent "legislation" as in Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380-381, 89 S.Ct. 1794, 1801-1802, 23 L.Ed.2d 371 (1969), the remarks of the Congressional Committee regarding the 1974 Amendments are not to be regarded as dispositive with regard to the construction of the Act and the regulations. Nothing in the 1973 Act indicates that Congress had any contrary intent than to create a means of enforcing § 504, however, and, thus, while not dispositive of congressional intent at the time the statute was enacted, the 1974 legislative history is certainly relevant to a determination of such intent
 
 
 [4]
 The cases cited by defendants are not on point. While this court theoretically applied the rational basis test in Coleman v. Darden, 595 F.2d 533 (10th Cir. 1979), cert. denied, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184, that case was not decided under § 504. We specifically held in Coleman that the plaintiff did not have a private right of action under § 504 because the defendant agency was not a program or activity receiving federal financial assistance. The case was decided on the basis of plaintiff's Fifth Amendment claim, and after review of the defendants' actions under the Administrative Procedure Act, 5 U.S.C. § 701, et seq. Under the Administrative Procedure Act the court can set aside the agency's action only if it is "arbitrary or capricious." 5 U.S.C. § 706(2)(A). We merely held in Coleman that the agency's actions were not arbitrary or capricious
 Similarly, in Counts v. U. S. Postal Service, 17 FEP cases 1161, (N.D.Fla.1978), vacated 631 F.2d 46 (5th Cir. 1980), plaintiff alleged a violation of both the equal protection guarantee of the Fifth Amendment and § 504. The case was decided solely on the basis of constitutional issues, since the court found that § 504 was not applicable. In Upshur v. Love, 474 F.Supp. 332 (N.D.Cal.1979), the plaintiff's cause of action was based on the equal protection clause of the Fourteenth Amendment, as well as § 504 and § 1983.
 In the instant case, we are faced solely with reviewing the matter under § 504, and we have determined that § 504 is fully applicable to this case. Therefore, the above cases are not relevant to our inquiry.
 
 
 [5]
 Applicants to the residency program usually apply at least a year prior to the date they seek admission to the program, and interviews are usually conducted between eight months to one year prior to the date of admission. In June, 1980, Dr. Pushkin intended to apply for the residency program which would begin on July 1, 1981. Since there was an opening for the July 1980 program, however, upon advice by Dr. Carter, Dr. Pushkin applied for the 1980 program instead. According to Dr. Barchilon, normally applicants were seen in clusters or in a series so they could be compared with one another, whereas Dr. Pushkin was seen alone, and thus could not be compared with other applicants as well