423 So.2d 1343 (1982)
Bill WADSWORTH d/b/a Bill's Construction Company
v.
YANCEY BROTHERS COMPANY.
80-520.
Supreme Court of Alabama.
September 3, 1982.
Rehearing Denied December 22, 1982.
Roger Killian, Fort Payne, for appellant.
Charles A. McGee, Fort Payne, for appellee.
JONES, Justice.
Appellant Bill Wadsworth appeals from an adverse judgment entered in an action by Yancey Brothers to recover a deficiency from the sale of a repossessed D-8-H Caterpillar tractor after Wadsworth defaulted on the conditional sales contract for which the tractor was collateral.

I. THE ISSUE
Debtor raises the issue whether, after debtor's default under a security agreement *1344 and creditor's repossession and sale of the collateral, creditor must allege and prove, as part of its prima facie case, ownership of the contract at the time it repossesses and sells the collateral as a prerequisite to its right of action against debtor for a deficiency balance. A secondary issue (or perhaps the primary issue restated), essential to the disposition of this appeal, is whether failure of creditor to give notice to debtor of the assignment of chattel paper, with recourse, altered debtor's obligation to the original creditor under the contract, where, after default for nonpayment, the creditor repossesses and sells the collateral prior to the reassignment of the contract to the original assignor.
Wadsworth also claims the trial court erroneously granted Yancey's motion for directed verdict with respect to his counterclaim for misrepresentation. Because the record reveals that, rather than granting a directed verdict, the trial court in fact designated the counterclaim as a defensive matter in the nature of a set-off, and charged the jury accordingly without objection, we hold that this alleged error is without merit. ARCP 51. Therefore, we limit our consideration on this appeal to the propriety of Yancey's conduct in the repossession and sale of the tractor.

II. THE FACTS
In May of 1978, Wadsworth and Yancey began negotiations for Wadsworth's purchase of the D-8-H tractor. After a one-month rental period under a "buy-try" agreement, which applied the rental payments to the tractor's purchase price, the parties consummated a "conditional sale security agreement" on July 26, 1978, listing a purchase price of $97,926.50 (repair costs and finance charges included). Shortly thereafter, the contract was assigned by Yancey to the First National Bank of Chicago,[1] and later reassigned to Yancey by the bank. The reassignment stamped on the back of the chattel paper bears no date. (The date of the reassignment is in dispute. We will return to this point later in the opinion.)
When Wadsworth defaulted on the contract, Yancey informed him of its intent to repossess the tractor and to dispose of it at a private sale in a "commercially reasonable manner." Wadsworth responded by indicating a willingness to voluntarily turn the tractor over to Yancey with the understanding that Yancey would attempt to sell the tractor at the best price possible and would also notify Wadsworth of any offers made and of any impending sale.
Following repossession of the tractor in October of 1979, Yancey informed counsel for Wadsworth that Yancey had received an offer of $60,000.00 which, if accepted, would leave a deficiency of $16,247.20. Upon Wadsworth's failure to consent to the sale, this offer was withdrawn. Of the 60 bid advertisements sent out by Yancey, only two were returned as offers. The highest of these was from Yancey and the tractor was sold to Yancey for $55,000.00 in November of 1979.
While the complete agreement is not set out, the record discloses that Yancey and the First National Bank of Chicago had a standing arrangement whereby Yancey made its own collections and took whatever steps it deemed necessary to protect its "with recourse" rights. Yancey's suit for deficiency was filed in February, 1980, and resulted in a jury verdict, and judgment entered thereon, for $22,000.00.

III. THE DECISION
The issue before us, then, in the context of the adverse ruling below, is the propriety of the trial court's denying Wadsworth's motion for directed verdict with respect to Yancey's repossession and sale of the tractor/collateral.
*1345 Ordinarily, the directed verdict test may be stated in evidentiary terms: It is the trial court's function to view the evidence most favorably to the non-moving party; and if, by any reasonable interpretation, it can support any inference of material fact sought to be proved by the non-moving party, the motion must be denied. This is true because it is the jury, not the court, that must pass upon the evidence, no matter how slight, when the proffered evidence, if believed, is sufficient to allow reasonable persons to fairly and reasonably make a finding favorable to the party having the burden of proving such fact. Herston v. Whitesell, 374 So.2d 267, 270 (Ala.1979).
Here, however, a two-pronged test is applicable: 1) The sufficiency vel non of evidence, giving rise to a reasonable inference supportive of a conclusion favorable to the non-moving party; and 2) assuming the first prong is met, whether such evidence, if believed, establishes each and every requisite element of plaintiff's claim. See Tew v. Jones, 417 So.2d 146 (Ala.1982).
It is the second prong of this two-pronged test that invokes our analysis of the legal issue stated under art. I: Under the facts of this case, given the "with recourse" assignment by Yancey to the bank without notice to Wadsworth, what are the respective rights of Yancey and Wadsworth upon Wadsworth's default for non-payment?
The parties place considerable stress upon the timing of the reassignment by the bank to Yancey. Wadsworth, in support of his contention that Yancey's repossession and sale was unauthorizedand thus that Yancey was not the proper party in interest to sue for a deficiencypoints to Yancey's own journal entry in December, 1979 (the date of Yancey's payment to the bank), as establishing the date of the reassignment. Yancey's claim that the reassignment occurred in March, 1979, is supported by some evidence that it repurchased all its outstanding "with recourse" chattel paper and assumed its own financing at that time, explaining that the journal entry reflects only the receipt of the sale price of the tractor.
The point of these respective contentions is that if the reassignment occurred in November, as contended by Wadsworth, Yancey's repossession and sale took place at a time when Yancey was not the owner of the contract authorizing such action. It follows, then, according to Wadsworth, that, because the repossession and sale were illegal, Yancey is barred from claiming a deficiency. On the other hand, if the reassignment occurred in March, the repossession and sale having occurred in October and November (all before the December journal entry date), Yancey was in fact the holder of the paper authorizing the repossession, the sale, and the suit for deficiency.
Because both dates precede the date of the suit (February, 1980), and because of our holding with respect to the legal relationship of the parties and their respective rights and obligations incident thereto, the time interval between the two dates, as contended by the parties, is not significant. Furthermore, because of our holding of affirmance on other grounds, it is unnecessary to address Appellee's contention that Wadsworth's express consent to the repossession waived the ownership of the contract issue (or, perhaps more accurately stated, estopped the Defendant from raising this issue).
Yancey's brief, in support of the trial court's ruling, states:
"The transaction [between Yancey and the bank] is one of chattel paper which has its explanation in the Uniform Commercial Code; however, Appellee submits that the Uniform Commercial Code does not alone govern the immediate question before the Court in that the common law and the agreement of Yancey and the financial institution govern this question. [See Code 1975, § 7-1-103.] The Uniform Commercial Code defines the term chattel paper and limits its treatment ... to the problem of perfection. The Uniform Commercial Code does not govern the rights of the `debtor' of the chattel paper transaction and the `secured party' of a chattel paper transaction. As a matter *1346 of fact, the Uniform Commercial Code (and its Alabama counterpart) expressly allows for different possibilities of collection methods including anticipated repossession from the original debtor by either the `debtor' of the chattel paper or the `secured party' of the chattel paper. This is evidenced by the Code of Alabama of 1975, § 7-9-207(1)....
"The first ... was the transaction in which [Wadsworth] granted to [Yancey] a security interest in [the tractor]. This transaction was evidenced by a conditional sales contract which is clearly governed by the Uniform Commercial Code. See Code of Alabama of 1975, § 7-9-102(2). The second security transaction was one in which Yancey gave a security interest in certain property to the financial institution in the nature of chattel paper, that is, Yancey had an obligation from Wadsworth to pay a sum of money under the conditional sales contract. This obligation was secured by Wadsworth's equipment. To obtain financing, Yancey borrowed money from the financial institution and gave as its collateral a security interest in the obligation due from Wadsworth and the security for that obligation [is] referred to under the present law as `chattel paper.' ...
"[The UCC] governs the validity of a sale of chattel paper, but the Code itself understands that the right of collection from the original debtor is a matter to be left to the discretion and agreement of the chattel paper debtor and the chattel secured party. Code of Alabama of 1975, § 7-9-207(1) points out this understanding in the Code."
While we are persuaded to the ultimate conclusion of Yancey's position, we find that Yancey's argument proceeds on a flawed premise.[2] As noted earlier, the record, gleaned from Yancey's own evidence, is in conflict with respect to the nature of the assignment by it to the bank. This conflict reappears in Yancey's brief. At one point, counsel for Yancey indicates that the chattel paper was transferred as security for borrowed money, and, at another point, he refers to the transaction as a sale, thus treating the assignment as a separate secured transaction.
The initial flaw in Yancey's argument is its failure to recognize that both transactions are indeed governed by the UCC. While § 7-1-103 makes clear that the general law of contract has not been abrogated by the UCC, and while those general principles are to be kept in mind, the priority of secured parties is governed entirely by Article 9 of the UCC. See, specifically, § 7-9-102(1)(b) (sale of chattel paper); § 7-9-102(2) (transfer for security of chattel paper); § 7-9-105(1)(a) (definition of account debtor), -(1)(b) (definition of chattel paper), -(1)(d) (definition of debtor); § 7-9-308 (priority of rights after outright sale of chattel paper); § 7-9-318 (rights of account debtor upon assignment); § 7-9-502 (collection rights of secured party); and § 7-9-504(5) (subrogation rights of chattel paper debtor).
Without detailing the substance of each of these sections, we believe that these sections, with accompanying Comments, clarify the status of the parties and define their rights and obligations under the facts before us.
The problem we find with the "two secured transactions" analysis is that the "second transaction" would have the legal effect of severing the assignor's interest; and the assignor could no longer act in its own right under the authority of the assigned contract. On the other hand, if the assignment to the bank was a mere pledge of the collateral for a concurrent or pre-existing debt, as opposed to an outright sale of the chattel paper, the pledgor never lost its status as a secured party. § 7-9-504(5).
*1347 While the distinction between the transfer for security of chattel paper and the outright sale of chattel paper may be of great materiality under other varying factual situations, it is a distinction without a difference in the instant case. See footnote 1, supra.
If we interpret the record as supporting an outright sale, then, there is ample evidence to support the conclusion that Yancey was acting in an agency relationship on behalf of the bank for the collection from the account debtor, and for its further activity in the repossession and sale of the collateral upon default. In addition to the explicit agreement with respect to collections, the conduct of the parties amply supports the agency authority of Yancey to perform all acts consistent with the holder's interest as a secured party.
If, on the other hand, we interpret the evidence as amounting to a transfer for security, then, Yancey was acting in its own behalf as a secured party in its repossession and sale of the collateral. That is to say, if Yancey's assignment was in the nature of a pledge of the chattel paper as security for a debt and not a sale of the chattel paper, Yancey's status as a secured party remained unaltered; and its rights to collect the payment, repossess upon default, sell the property, and sue for deficiency, if any, are all governed by the applicable sections of the UCC.
Finding no error in the trial court's refusing to grant Wadsworth's motion for directed verdict, we affirm the judgment.
AFFIRMED.
FAULKNER and ADAMS, JJ., concur.
TORBERT, C.J., and SHORES, J., concur specially.
TORBERT, Chief Justice (concurring specially).
I agree that the decision of the trial court should be affirmed, but I would address the issue differently.
The majority correctly identifies the central issue in this case: "[W]hat are the respective rights of Yancey and Wadsworth upon Wadsworth's default for non-payment?" In undertaking an analysis of these rights it is important to conceptualize the transactions clearly. There are, in fact, two security transactions involved in this case. First, Yancey Brothers, the seller, became a secured party in relation to the equipment sold to Wadsworth, the debtor/purchaser. Second, upon the transfer of its security agreement to the Bank, the Bank became a secured party with Yancey Brothers being its debtor. While the Bank's security interest in the chattel paper or in the collateral itself certainly would make it an interested party on repossession or disposition of the collateral, I find no statutory authority for cutting off the seller's rights on return or repossession of the underlying collateral.
The appellant argues that Yancey no longer owned the chattel paper at the time of the repossession, while the appellee maintains that the transfer to the Bank was not a sale but merely a transfer for security. The Uniform Commercial Code recognizes that it is not always necessary to distinguish these two transactions:
"Commercial financing on the basis of accounts ... and chattel paper is often so conducted that the distinction between a security transfer and a sale is blurred, and a sale of such property is therefore covered by [Article IX] whether intended for security or not.... The buyer then is treated as a secured party, and his interest as a security interest."
Official Comment 2, Ala.Code § 7-9-102 (1975).
The U.C.C. does not directly address the issue of the rights of the holder of chattel paper in the underlying collateral. However, the Alabama version of the U.C.C. does make explicit provision for those situations in which the seller/assignor repossesses the underlying collateral:
"(5) If a sale of goods results in an account or chattel paper which is transferred by the seller to a secured party, and if the goods are returned to or are repossessed by the seller or the secured *1348 party, the following rules determine priorities:
"....
"(b) An unpaid transferee of the chattel paper has a security interest in the goods against the transferor."
Ala.Code § 7-9-306(5)(b) (1975). Because of the operation of § 7-9-306(5)(b), on return of the goods to the seller, the holder of chattel paper has a security interest in the underlying collateral which is superior to the interest of the seller.
This approach adequately protects the secured parties regardless of whether the transaction is an absolute sale or an assignment for security of the chattel paper. In either case, following the "transfer" of the chattel paper, on repossession or return of the goods to the seller, the bank/secured party has an interest in the collateral superior to that of the seller/secured party. Again, however, the seller's interest is not completely cut off. The Comments indicate that the nature of the seller's interest in the collateral will depend upon the agreement between the seller and the bank:
"In cases of repossession by the dealer and also in cases where the chattel was returned to the dealer by the voluntary act of the account debtor, the dealer's position may be that of a mere custodian; he may be an agent for resale, but without any other obligation to the holder of the chattel paper; he may be obligated to repurchase the chattel, the chattel paper or the account from the secured party or to hold it as collateral for a loan secured by a transfer of the chattel paper or the account."
Official Comment 4, Ala.Code § 7-9-306 (1975) (emphasis added).
In the case before us, I would hold that Wadsworth has no right or standing to raise an issue as to the nature of the relationship between Yancey Brothers and the Bank. As between these parties it appears that there is no dispute involving the action taken to dispose of the collateral and that the U.C.C. provides adequate protection of their conflicting interests in the event of a dispute. Thus, I would affirm the trial court's judgment.
SHORES, J., concurs.
NOTES
[1] Whether the original assignment by Yancey to the bank was an outright sale or a transfer for security is not clear in the record. Admittedly, if the bank were a party to these proceedings, claiming, for example, the right of repossession as against Yancey, the true nature of the assignment, of course, would be material in determining the rights and obligations of the parties. As later discussed under part III of the opinion, however, whether the assignment was a sale or a transfer for security is immaterial as between Yancey and Wadsworth.
[2] Recognizing that counsel are rarely offended by criticism when they win, we, nonetheless, should be careful to point out that our `nit-picking' process is not intended as criticism. Indeed, we commend both counsel for their diligence and ingenuity in the treatment of this novel issue. Rather, we chose the process of countering Appellees' various contentions as a convenient vehicle for our analysis and treatment of the issues presented.