656 So.2d 347 (1995)
Tommy GRESHAM
v.
SCHLUMBERGER INDUSTRIES, INC.
1931223.
Supreme Court of Alabama.
February 17, 1995.
Donald R. Harrison, Dadeville, for appellant.
Michael S. Jackson of Beers, Anderson, Jackson & Smith, Montgomery, for appellee.
COOK, Justice.
Tommy Gresham appeals from a judgment based on a directed verdict in favor of the *348 defendant Schlumberger Industries, Inc., on Gresham's claim seeking damages for an alleged retaliatory discharge. We reverse and remand.
In December 1989, Tommy Gresham injured himself while working at Schlumberger's plant. Following back surgery, his physician gave him a 10% impairment rating. He returned to work in July 1990. According to Gresham, he was again injured in October 1990, but continued to work until December of that year, when his back condition forced him to again seek medical attention. In February 1991, Gresham had surgery on his back; he was assessed an additional 2% impairment rating as a result of his second injury. In July 1991, Gresham's doctor released him for light-duty work, with the following restrictions: "no lifting more than 35 pounds; no walking more than two hours; no standing more than two hours; no prolonged squatting; no bending; limited reaching; and no twisting". Appellee's Brief, p. 10, quoting R.T. 76-77.
It is not disputed that the job Gresham had before his injury required him to lift weight outside the limitations imposed by the doctor. Gresham testified that after his doctor imposed the restrictions he contacted Schlumberger approximately 20 times over the next few months to inquire about a light-duty job. Paul Schindler, Schlumberger's personnel director, testified that there were no jobs available that permitted him to work within the restrictions prescribed by his doctor. Hence, Schlumberger contended, it told Gresham that when those limitations were lifted, it would see about finding an appropriate job for him. In January 1992, the doctor, at Gresham's request, revised Gresham's lifting limitation to 50 pounds; however, the other restrictions remained in place. Again, Schlumberger informed Gresham that there were no jobs within the restrictions prescribed by his doctor. Gresham's medical restrictions remained in place from December 1990 until July 1992. He was paid temporary total disability benefits from December 1990 through December 1991 and during that time Schlumberger paid all his medical expenses. Gresham testified that in January 1992, a few weeks after he had settled his worker's compensation claim against Schlumberger, he contacted Paul Schindler to inquire about a job at the plant.
"A. I called Paul Schindler on the 10th January the 10th to check on my job status.
"Q. What, if anything, was said to you by Mr. Schindler?
"A. I asked him could I come down. I mainly called to see if he was in. And he told me there wasn't no need in coming down. He said that he had talked to Hank Golden and others and they had decided to terminate me.
"Q. Was that all he said? Did he say anything about your injury?
"A. He did not say nothing about my injury. He said they didn't have no light-duty work and he thought it was best for the company to terminate me.
"Q. Did he say anything about disabilities and light duty?
"A. He just said he didn't have nothing on light duty.
"Q. Nothing about disabilities?
"A. Noabout disabilities? He did. He did say something about disabilities. He said if he was going to bring somebody back to work that it wouldn't be somebody that wasthat had disabilities.
"Q. Now, he told you you were terminated?
"A. Yes, sir.
"Q. So what, if anything, did you do after that?
"A. I went to Steve Schmitt's office in Tallassee, which is an attorney. And talked to Steve Schmitt and Clay Hornsby, which iswas an associate of his. And they
"Q. Let me ask you this. When was the next time you contacted Schlumberger?
"A. The following Monday I had a phone call asking me to come talk to Paul Schindler.
"Q. ....

*349 "A. I went down to ... Schlumberger to talk to them. And they tried to make amends, saying that they had used the wrong words in termination.
"Q. What did they say other than termination? Who was it you're talking to now?
"A. I was talking to Paul Schindler.
"Q. Was he the only one?
"A. He was the personnel director.
"Q. Was he the only one present other than yourself?
"A. Bob Forester, I think, was in there and either Charlotte Cannon or Debra Davis was in there. I know one of the ladies in the office was in there.
". . . .
"Q. And on January the 17th of 1992, after he told you you were terminated, Mr. Schindler now says that you haven't lost you job?
"A. Yes, sir.
"Q. You're still employed there?
"A. Yes, sir.
"Q. Did he tell you then that they had a rule that after twelve months' leave of absence, medical leave of absence, without coming back to work at any time during that period that you were considered automatically to have quit your job?
"A. No, sir.
"Q. He didn't inform you anything about that rule
"A. No, sir.
"Q. on January the 17th?
"A. No sir.
"Q. Did anybody else say anything?
"A. I asked him when was I supposed to report back to work.
"Q. What, if anything, did he say in reply to that?
"A. He told me to get my limitations lifted, my restrictions from Dr. Patrick Ryan, and that he would put me back to work. He said, the ball is in your court.
"Q. Okay. What, if anything, did you do after that?
"A. I proceeded to call Dr. Patrick Ryan to try to get him to lift my restrictions so I could get some gainful employment.
"Q. Now, were your restrictions lifted?
"A. Yes, sir. He lifted them to a 50-pound weight limit I think."
R.T. 49-54.
Schlumberger did not place Gresham on light duty following his surgery. In June 1992, Schlumberger sent Gresham a letter stating that he had been on leave of absence for over one year and that, according to company policy, he was considered to have voluntarily relinquished his employment as of June 1, 1992. Gresham thereafter filed this action, alleging retaliatory discharge.
At trial, Gresham testified that before the termination no one at Schlumberger had told him of the one-year leave of absence policy and that he was never given a copy of the policy. R.T. 37. He further stated that he had repeatedly requested to go back to work at Schlumberger, but was consistently told there was no job available for him. While Schlumberger argues that there was no evidence that it even had light-duty jobs available within the limitations set by Gresham's physician, a Schlumberger management employee testified that some "light-duty" jobs were available at the plant, although he did not testify at length regarding the details of the requirements for those jobs.
Section 25-5-11.1, Code of Alabama 1975, states:
"No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter or solely because the employee has filed a written notice of violation of a safety rule pursuant to subdivision (c)(4) of Section 25-5-11."
In determining whether the trial court erred in directing a verdict for Schlumberger, we must apply the following rule:
"We must determine whether the party with the burden of proof has produced sufficient evidence of a conflict warranting *350 a jury's consideration. Macon County Comm'n v. Sanders, 555 So.2d 1054, 1056 (Ala.1990); Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988). The evidence must be viewed in a light most favorable to... the nonmoving party. Twilley v. Daubert Coated Products, Inc., 536 So.2d 1364, 1367 (Ala.1988); Wadsworth v. Yancey Bros. Co., 423 So.2d 1343, 1345 (Ala.1982)."
Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313, 319 (Ala.1992).
"In Twilley v. Daubert Coated Products, Inc., 536 So.2d 1364 (Ala.1988), we determined the evidence necessary to sustain an action pursuant to [§ 25-5-11.1]:
"`We hold that an employee may establish a prima facie case of retaliatory discharge by proving that he was "terminated" because he sought to recover worker's compensation benefits, which would be an impermissible reason. The burden would then shift to the defendant employer to come forward with evidence that the employee was terminated for a legitimate reason, whereupon the plaintiff must prove that the reason was not true but a pretext for an otherwise impermissible termination.'"
"536 So.2d at 1364."
Hayden v. Bruno's, Inc., 588 So.2d 874, 876 (Ala.1991). See also Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313, 319 (Ala.1992).
"We note that it would be more appropriate to say that, after the defendant has met his burden of coming forward with evidence of a legitimate reason, `"[t]he plaintiff then has the burden of going forward with rebuttal evidence showing that the defendant's [stated] reasons"' for terminating the plaintiff are not true. Twilley, 536 So.2d at 1369, quoting Pushkin v. Regents of the University of Colorado, 658 F.2d 1372, 1387 (10th Cir.1981)."
Culbreth v. Woodham Plumbing Co., 599 So.2d 1120, 1122 (Ala.1992).
In Culbreth, Woodham Plumbing Company informed an employee who had been on medical leave that the company had no job available for him. This Court stated:
"If we were to say that, as a matter of law, the reason given by Woodham Plumbing is a conclusively legitimate reason, the beneficent purposes of [§ 25-5-11.1] would be significantly undermined. An employer could almost always say either `we hired someone to take your place,' or `we no longer have enough business to continue your employment.' Thus, we think a jury question is presented as to whether Woodham Plumbing's asserted reason is a legitimate one or only a pretext."
Culbreth, 599 So.2d at 1123.
Gresham presented evidence tending to show that he was never told about Schlumberger's policy with regard to leaves of absence exceeding one year. Furthermore, Gresham testified that in January 1992 the company told him he was terminated and then called him in to say that the employee who had informed him that he was being terminated had misspoken. Additionally, Gresham testified that he was told by Schindler that "if he was going to bring somebody back to work that it wouldn't be somebody that wasthat had disabilities." Although his discussions with Schlumberger in January 1992 occurred after Gresham had been on leave of absence for more than one year, he contended at trial that no one ever informed him of the 12-month leave policy and that, despite continuous attempts to be placed on light-duty, he was never told that the company had considered him to have voluntarily quit his job. Viewing the evidence in a light most favorable to Gresham, Mokrzycki, supra, we conclude that Gresham's evidence at trial presented a disputed issue of factwhether the reasons Schlumberger gave for Gresham's termination were pretextual. Therefore, the trial court erred in directing a verdict in favor of Schlumberger. The judgment based on that directed verdict is reversed and the cause is remanded.
REVERSED AND REMANDED.
ALMON, SHORES and KENNEDY, JJ., concur.
HOUSTON, J., concurs specially.
*351 HOUSTON, Justice (concurring specially).
In my opinion, the trial court did not err in restricting the testimony of Billy Mack Gray, which was introduced to show that Schlumberger had a pattern and practice of terminating employees who filed workers' compensation claims. For pattern or practice evidence to be admissible, there must be substantial similarity between the event involved in the lawsuit and the earlier events alleged to be part of a pattern or practice. Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313, 319 (Ala.1992). Gray admitted that he had not been terminated for being away from his work for more than one year. Gray testified that Schlumberger had a three-step disciplinary process that it followed before terminating an employeea verbal warning, a written warning, and a suspension without pay. Gray had been subject to each of these three steps and was terminated for absenteeism and tardiness. The facts regarding Gray's termination and the facts regarding Gresham's "termination"claimed by Schlumberger to have been a "voluntary relinquishment" of employmentwere not substantially similar. Thus, Gray's testimony did not qualify as evidence of a pattern or practice.