George William PRIDEMORE, Plaintiff,

v.

RURAL LEGAL AID SOCIETY OF WEST CENTRAL OHIO, Defendant.

No. C–3–84–754.

United States District Court, S.D. Ohio, W.D.

Nov. 19, 1985.

George Pridemore, Middletown, Ohio, pro se.

Neil F. Freund, Jane M. Lynch, Dayton, Ohio, for defendant.

DECISION AND ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC # 20); PLAINTIFF'S MOTION TO RECUSE (DOC. # 19) OVERRULED; PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT UNTIMELY FILED AND NOT RULED UPON (DOC. # 23); OTHER MOTIONS (DOCS. # 15, 16) DEEMED MOOT; JUDGMENT TO DEFENDANT AND AGAINST PLAINTIFF; TERMINATION ENTRY

RICE, District Judge.

This case comes before the Court for resolution of the Motion for Summary Judgment filed on June 21, 1985 by Defendant Rural Legal Aid Society of West Central Ohio (RLAS) (Doc. # 20). Plaintiff, a lawyer licensed to practice law in the State of Ohio, who is representing himself in this action, filed a pleading styled "Plaintiff's Motion for Summary Judgment and Motion Contra Defendant's Motion for Summary Judgment" on August 14, 1985 (Doc. # 23).

▮ To the extent that Plaintiff's August 14th filing sought to contest Defendant's motion, it was filed approximately 29 days late. To the extent that Plaintiff sought to assert a Motion for Summary Judgment, said filing came nearly two months after the June 24, 1985 motions cut-off date in this case. *See* Preliminary Pretrial Conference Order (Doc. # 6). In the interest of giving fair consideration to Defendant's Motion for Summary Judgment, Plaintiff's August 14th filing has been considered as a memorandum *contra* Defendant's Motion for Summary Judgment, despite its untimely filing. Defendant's Reply Memorandum has also been considered (Doc. # 24). As Plaintiff did not seek leave of this Court to file an untimely Motion for Summary Judgment, Plaintiff's August 14th memorandum has not been treated as a Motion for Summary Judgment by the Court, and the Court makes no ruling upon any such request for relief by Plaintiff.

I. *Plaintiff's Claim of Handicap Discrimination by Defendant on the Basis of Plaintiff's Cerebral Palsy.*

(A) *Facts*

Plaintiff, as mentioned *supra,* is a lawyer. He contacted Defendant, through a letter and resume, about the possibility of employment in late 1982 or early 1983. (Pridemore Deposition, p. 38). The record reveals that Defendant, faced with an imminent staff attorney vacancy in the summer of 1983, decided to hire an interim staff attorney to serve until funds for the position ran out at the end of the year. Applications were solicited in the August 1, 1983 edition of the Ohio Bar Association Reports. Letters were sent to lawyers, including Plaintiff, who had submitted unsolicited resumes during the preceding year. Defendant's letter to Plaintiff, asking him to interview for the position if he remained interested, contained a correct address, but an inaccurate zip code. Plaintiff was interviewed by Defendant for a position of staff attorney on August 8, 1983, and submitted a seven-page letter to members of Defendant's interview committee regarding his application. (Pridemore deposition, Exh. 4). Plaintiff was not offered the job. Plaintiff alleges in his Complaint that Defendant denied him employment solely on the basis of his condition of cerebral palsy. He charges Defendant with handicap discrimination in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (West Supp.1976–84).[1]

---

1. 29 U.S.C. § 794 provides as follows:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the

(B) *Legal Analysis*

In *Jasany v. United States Postal Service*, 755 F.2d 1244, 1249–50 & n. 5 (6th Cir.1985), the Sixth Circuit quoted with approval the test for claims of handicap discrimination outlined by the Tenth Circuit in *Pushkin v. Regents of University of Colorado*, 658 F.2d 1372 (10th Cir.1981). In *Pushkin*, the first two steps of the method of evaluating Title VII claims set forth by the Supreme Court in cases such as *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972), were adapted to cases of handicap discrimination as follows:

> (1) The plaintiff must establish a *prima facie* case by showing that he was an otherwise qualified handicapped person *apart from* his handicap, and was rejected under circumstances which give rise to the inference that his rejection was based solely on his handicap;
>
> (2) Once plaintiff establishes his *prima facie* case, defendants have the burden of going forward and proving that plaintiff was not an otherwise qualified handicapped person, that is one who is able to meet all of the program's requirements *in spite of* his handicap, or that his rejection from the program was for reasons other than his handicap....

755 F.2d at 1250 n. 5.

As set forth in *Jasany*, the first prong of Plaintiff's *prima facie* case of handicap discrimination requires that he be a member of the class of handicapped persons protected by Section 504. The relevant statutory definition is contained in 29 U.S.C. § 706(7)(B), which provides that a "handicapped individual" is one who

> (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.

The "major life activities" referred to in Section 706(7)(B) are in turn defined in 45 C.F.R. § 84.3(j)(2)(ii) as "functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."

■ Plaintiff's cerebral palsy was first diagnosed by a physician in approximately November, 1984. (Pridemore deposition, p. 72). Plaintiff explains, in his August 14th memorandum, the impact of this condition upon his muscular control. (Doc. # 23). Plaintiff's condition causes him to have poor control over his ocular muscles, which he says limits his ability to read and to make sustained eye contact. He also states in his memorandum that he has speech defects due to his cerebral palsy, but his speech can be understood by listeners. After careful scrutiny of the record, the Court concludes that summary judgment must be entered against Plaintiff on the basis that his condition of cerebral palsy does not render him a "handicapped individual" within the meaning of 29 U.S.C. § 706(7)(B).

While the Court in no way seeks to denigrate Plaintiff's condition of cerebral palsy, 29 U.S.C. § 706(7)(B)(i) requires that an impairment *substantially* limit a major life activity in order for a person to qualify as a "handicapped individual." *Jasany*, 755 F.2d at 1248. There is no genuine issue of material fact on this record as to the absence of such a substantial limitation upon Plaintiff's major life activities by virtue of his cerebral palsy. Plaintiff explained in his deposition that he had been diagnosed as having a "borderline" case of cerebral palsy. (Pridemore deposition, p. 72). He further explained that, due to the mildness of his condition, his cerebral palsy can be detected only with the use of sophisticated diagnostic medical equipment. (Pridemore deposition, p. 71). To the extent that Plaintiff's cerebral palsy affects his reading and

---

United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

speaking abilities, not only can the level of limitation not be considered substantial, but Plaintiff states in his August 14th memorandum that any such reading or speaking difficulties do not in any way interfere with his ability to practice law. (Doc. # 23). Clearly, then, these two major life activities of Plaintiff cannot be found to be substantially limited by his borderline cerebral palsy. Nor are there any indications in the record as to any other major life activities which can be found to be substantially limited.

Under 29 U.S.C. § 706(7)(B)(ii), a person who has a *record* of an impairment which substantially limited one or more of his major life activities qualifies as a "handicapped individual." This subsection extends the protection of Section 504 to individuals who have recovered in whole or in part from a handicapping condition and to those individuals who have been classified at one point as handicapped. S.Rep. No. 93–1297, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 6373, 6388–89. As Plaintiff's cerebral palsy was not diagnosed until late 1984, at which time he had already completed law school and the events in this case had already occurred, he has no such record of cerebral palsy.

■■■ Finally, Plaintiff could qualify as a "handicapped individual" under 29 U.S.C. § 706(7)(B)(iii) if members of Defendant's interview committee could be shown to have regarded Plaintiff as suffering from a condition of cerebral palsy which substantially limited one or more of his major life activities. Such a perception by Defendant would allow Plaintiff to claim the protection of Section 504, even if his condition did *not* substantially limit his major life activity or activities. S.Rep. No. 93–1297, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Ad.News 6373, 6388–89. The Court finds Defendant to have carried its burden as to the absence of material factual dispute on this issue. Plaintiff has not created a genuine issue of material fact as to whether Defendant knew that Plaintiff suffered from cerebral palsy and that Defendant erroneously believed that this condition was a substantially limiting impairment within the meaning of 29 U.S.C. § 706(7)(B)(iii).

Plaintiff stated at his deposition that he did not mention his cerebral palsy to the members of Defendant's interview committee who met with him on August 8, 1983. (Pridemore deposition, p. 101–03, 123). Plaintiff also testified that a lay person would not know that Plaintiff suffered from cerebral palsy after observing his outward appearance and demeanor. *Id.* at 123–24. The only written document which Plaintiff believes could have informed Defendant as to his cerebral palsy was the seven-page letter which Plaintiff provided to members of Defendant's interview committee at the time of his interview. *Id.* at 105–07. The letter did not state that Plaintiff had cerebral palsy.[2] Plaintiff's contention at his deposition was that his cerebral palsy could have been inferred from the statements in the letter. *Id.* at 105–06, 123–25. The first of those statements provided as follows: "I was born, after a difficult delivery, with miniscule brain damage to the perceptual and sensory-motor areas of the brain in 1952." (Pridemore deposition, Exh. 4 at 1). The second of those statements would be the final sentence of the letter, which admonished: "Whatever your decision here today, I hope you do not turn me down in violation of the Rehabilitation Act of 1973." *Id.* at 7.

The Court cannot agree that these statements in Plaintiff's letter raise a genuine issue as to Defendant's knowledge of Plaintiff's cerebral palsy. The second statement is devoid of any substantive content. As for the first statement, the Court notes Plaintiff's own admission that a lay person would not be aware that the type of infantile brain damage alluded to by Plaintiff

---

**2.** As Plaintiff states that a physician did not diagnose his cerebral palsy until 1984, he would have had to base any claim of this condition either on his own speculation or upon sources not disclosed in his deposition.

would indicate a diagnosis of cerebral palsy. (Pridemore deposition, p. 125).

Having considered all three subsections of 29 U.S.C. § 706(7)(B), the Court finds no factual issues to exist or to have been created with respect to Plaintiff's qualification as a "handicapped individual" by virtue of his cerebral palsy. Plaintiff has failed to demonstrate a genuine issue of material fact on his qualifying as such a "handicapped individual." Consequently, summary judgment must be entered against Plaintiff and in favor of Defendant, on the grounds that Plaintiff cannot establish a *prima facie* case of handicap discrimination.

## II. *Other Motions Remaining for Disposition.*

■ As is apparent by the very fact of this ruling, Plaintiff's motion for recusal, contained in his final pretrial order (Doc. # 21), is overruled. Plaintiff's displeasure with this Court stems from the earlier opinion of this Court in *Moxley v. Vernot*, 555 F.Supp. 554 (S.D.Ohio 1982). The Court is compelled to note that said decision accurately reflected and conformed with existing federal law then on point at the time it was rendered in 1982. Simply because the United States Supreme Court took an opposing point of view in a later unrelated opinion does not mean that the instant Court is irretrievably prejudiced in ruling in this case. Moreover, the Court cannot accept Plaintiff's contention that scheduling deadlines have been manipulated in order to render difficult Plaintiff's pursuit of this litigation. This Court's scheduling deadlines not only impact equally upon both sides to this litigation, but also reflect this Court's standard practice followed in all cases upon its docket.

As Plaintiff did provide Defendant with medical authorizations to obtain certain records, Plaintiff's motion to vacate discovery (Doc. # 15) is moot. Defendant's motion to dismiss or, alternatively for sanctions, based on the same discovery dispute (Doc. # 16), is also moot.

## III. *Whether, Even Assuming Plaintiff to be a "Handicapped Individual," Plaintiff Could Establish a Prima Facie Case of Handicap Discrimination.*

The Court notes that, as a result of its decision in Part I of this opinion that Plaintiff does not qualify as a "handicapped individual," Part III of this decision contains only the dicta of this Court.

■ The Court's observations in the instant Part III are prompted by Plaintiff's statement in his deposition that he has two handicaps other than his cerebral palsy: a learning disability and a history of treatment for mental depression. (Pridemore deposition, p. 63, 73, 87, 115–16). As noted in Part I, Plaintiff's Complaint alleges cerebral palsy as the handicap which served as the sole basis for Defendant's discrimination against him. No other handicap is mentioned. Plaintiff reiterated in a subsequent motion that "cerebral palsy is the sole handicap condition alleged in the complaint." (Doc. # 15). Plaintiff's August 14th memorandum only reinforces his total focus upon cerebral palsy and its symptoms. (Doc. # 23). Furthermore, Plaintiff is a lawyer, unlike most pro se litigants. Lawyers are expected to bring directly before the Court all those conditions and circumstances which are relevant in a given case. Plaintiff plainly has not brought before the Court any allegations concerning his mental depression and his learning disability. This being said, the Court nonetheless believes that, in the interests of justice, brief consideration should be given to these two additional handicapping conditions. Part III of this opinion contains the Court's conclusion that, even with these additional handicap conditions, Plaintiff would not be found to state a *prima facie* case of handicap discrimination.

### (1) *Plaintiff's Possible Membership in the Protected Class.*

■ Having scrutinized Plaintiff's discussion in his deposition of his learning disability and of his mental illness, the Court believes that Plaintiff's history of

treatment for mental depression[3] could render him a "handicapped individual" under 29 U.S.C. § 706(7)(B). Plaintiff was hospitalized for mental depression at the Institute of Psychiatry at Northwestern Memorial Hospital in Chicago in the summer of 1978. (Pridemore deposition, p. 79). He was re-admitted over the Christmas holidays in December, 1978. Plaintiff withdrew from law school for the spring semester of 1979, feeling that he could not complete his education at that time. (Pridemore deposition, p. 80). He was admitted to the Illinois State Psychiatric Institute for a week in early 1979, and then spent eighty-three or so days again at the Institute of Psychiatry at Northwestern Memorial Hospital in mid-1979. While Plaintiff does not discuss his ability to function during this period in 1978–79, the Court believes that such a history of psychiatric treatment could indicate that Plaintiff's depression substantially limited a major activity during this period, namely, his ability to care for himself. *Cf. Doe v. New York University*, 666 F.2d 761, 775 (2d Cir.1981). Plaintiff had a record of such an impairment when he applied for a position with Defendant, and this history of depression was both mentioned in the letter submitted at the interview as well as discussed verbally at his interview. (Pridemore deposition, p. 101–103).[4]

As for the sensory integration dysfunction claimed by Plaintiff in his deposition, certain exhibits attached to Plaintiff's August 14th memorandum, none of which are properly authenticated as required by Fed. R.Civ.P. 56, explain the nature of this dysfunction. His learning disability apparently involves some rather subtle difficulties with balance, coordination and fine and gross motor development. There is no indication whatsoever that this dysfunction, which was diagnosed in the spring of 1980 after Plaintiff's completion of law school, substantially limits one or more of Plaintiff's major life activities, within the meaning of 29 U.S.C. § 706(7)(B)(i). Likewise, there is no record of any period during which this dysfunction so substantially limited Plaintiff, within the meaning of 29 U.S.C. § 706(7)(B)(ii).

The Court believes, however, that a genuine issue of material fact would exist under 29 U.S.C. § 706(7)(B)(iii) as to whether Defendant regarded Plaintiff as suffering from a learning disability which substantially limited his major life activity or activities, even if his condition did not in fact have such an impact upon his activities. Defendant had knowledge of Plaintiff's sensory integration dysfunction due to Plaintiff's mention of this dysfunction, and the therapy which he has undergone for it, in the letter submitted to Defendant at his interview. (Pridemore deposition, Exh. 3). This Court could not, had Plaintiff pled his learning disability as the basis for Defendant's discrimination against him, conclude that no genuine issue of material fact existed as to whether Defendant regarded Plaintiff as suffering from a substantially limiting learning disability.

In summary, had Plaintiff properly presented, as bases for his claim, his handicaps of a history of mental illness and a learning disability, the Court would find him to be a "handicapped individual" on the basis of his record of mental illness and would find a genuine issue of material fact as to whether Defendant perceived Plaintiff as having a substantially limiting learning disability.

(2) *Whether Plaintiff Could be Found to be "Otherwise Qualified."*

Assuming Plaintiff to be a "handicapped individual" due to his record of mental ill-

---

3. The Court notes that Plaintiff makes no claim in his deposition that he currently suffers from a handicap of mental illness, and the Court does not consider same.

4. As noted *supra* in Part I, the legislative history of Section 706(7)(B)(ii) reveals Congress' intent that the protection of Section 504 be extended to those individuals with a record of a substantially limiting impairment, even if the individual could be shown to have recovered in whole or in part from that handicapping condition. S.Rep. 93–1297, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Adm.News 6363, 6388.

ness or to Defendant's perception of his learning disability, the second component of Plaintiff's *prima facie* case under Section 504 would require consideration of whether Plaintiff was "otherwise qualified" for Defendant's staff attorney position. The Supreme Court has defined an "otherwise qualified handicapped individual" as "one who is able to meet all of a program's requirements in spite of his handicap," provided that none of those requirements are "unreasonable and discriminatory." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 412–413, 99 S.Ct. 2361, 2367, 2370, 60 L.Ed.2d 980 (1979). Regulations promulgated by the Department of Health and Human Services define a "qualified handicapped person" as one "who, with reasonable accommodation, can perform the essential functions of the job in question." 45 C.F.R. § 84.3(k)(1).

Defendant contends that Plaintiff was not selected for the interim staff attorney position because, wholly apart from any handicap claimed by him, he lacked certain attributes believed to mark a successful candidate. Defendant's Executive Director, Roy Martin, avers that Plaintiff did not demonstrate effective communication skills, nor did he establish an ability to exercise sound professional judgment. (Martin Affidavit, Doc. # 19, Exh. A, ¶ 13, 14, 15). Martin bases his conclusion upon Plaintiff's performance at his interview and upon the contents of a seven-page letter which Plaintiff presented to members of Defendant's interview committee during his interview. (*Id.* at ¶ 8, 13, 14, 15). Martin also states that Plaintiff's resume reflected his unemployment from 1981 through 1983 and a lack of experience in the Ohio courts. (*Id.* at ¶ 10). For these reasons, Defendant's position is that, despite the fact that Plaintiff had a law degree from an accredited institution and that he had passed the Ohio bar examination, Plaintiff was not "otherwise qualified" for their interim staff attorney position.

█ The Court agrees that the organizational and intellectual demands of the position of staff attorney could be considered in the determination of whether a handicapped professional is "otherwise qualified." *See Pushkin v. Regents of University of Colorado,* 658 F.2d at 1385–90 (consideration of whether a psychiatrist, who suffered from cerebral palsy, was "otherwise qualified" included not only whether he possessed necessary academic degrees, but whether he possessed the experience, intellect and emotional disposition to be a successful psychiatrist); *see also Upshur v. Love,* 474 F.Supp. 332, 342 (N.D.Cal. 1979) (blind candidate for position as school administrator found not "otherwise qualified" due to his lack of experience and familiarity with school administration.) The skills and attributes which Defendant put forth in its definition of the interim staff attorney it sought to hire appear no more arbitrary and discriminatory than those characteristics contemplated at trial by the *Pushkin* and *Upshur* courts.

This being said, had the Court in fact considered whether Plaintiff was handicapped on the basis of his record of mental illness or due to Defendant's perception of his learning disability, it would have been forced to find that a genuine issue of material fact existed as to whether Plaintiff was "otherwise qualified." The Court does not believe that this issue could be resolved against Plaintiff on summary judgment, given the dependence of this issue upon Defendant's evaluation of Plaintiff's credentials and upon Defendant's good faith but subjective requirements for the position which it sought to fill. Thus, to complete its treatment of the record, the Court concludes that, had mental illness or a learning disability been presented as a basis for discrimination, *which they were not,* the Court would have found a genuine issue of material fact to exist as to whether Plaintiff was "otherwise qualified."

(3) *Whether Plaintiff Would be Found to Have Been Rejected Under Circumstances Giving Rise to an Inference of Handicap Discrimination.*

Assuming Plaintiff to have been an "otherwise qualified handicapped individual

apart from his handicap," the final prong of Plaintiff's *prima facie* case would require consideration of whether Plaintiff was rejected under circumstances giving rise to the inference that his rejection was based solely on his handicap(s). *Jasany*, 755 F.2d at 1250. Had this consideration been put forward to the Court, it would have concluded that Defendant has established the absence of a genuine issue as to any material facts susceptible of an inference that Plaintiff was rejected by Defendant solely on the basis of his record of mental illness or a perception that he was substantially limited due to his learning disability. Plaintiff has failed to create a genuine issue as to any such facts.

As noted *supra* in Part I, Defendant's letter to Plaintiff, asking him to interview for the position if he remained interested, contained a correct address, but an inaccurate zip code. Plaintiff asserts that Roy Martin, or another staff person employed by Defendant, intentionally placed an inaccurate zip code on Plaintiff's letter in order to delay its arrival. Plaintiff's belief is that the inaccurate zip code, the short period of time between the mailing date of the letter and the scheduled interview date, and Defendant's failure to ask Plaintiff to bring additional materials or information with him to the interview indicate that Defendant did not in good faith interview Plaintiff due to Plaintiff's status as a handicapped individual. (Pridemore deposition, p. 93–98). Plaintiff also asserts that Roy Martin's knowledge of Plaintiff's threat in August, 1983, to sue the Dayton Legal Aid Society for handicap discrimination, is an additional basis for his claim that circumstances of his treatment by Defendant raise the inference that he was rejected solely on the basis of his handicap.

■ The issue is not whether Plaintiff agrees with the method in which Defendant attempted to meet its immediate need for a staff attorney, but whether Defendant's interview process raises the inference that Plaintiff was rejected solely on the basis of his handicap of past mental illness. The Court cannot agree with Plaintiff's inference of discrimination by virtue of an inaccurate zip code. It is difficult to accept that Defendant would have cloaked its discriminatory animus by scheduling an interview for Plaintiff and mailing him a letter containing the interview date, all the while gambling that a deliberately inaccurate zip code would delay the arrival of the letter and inalterably stymie Plaintiff's pursuit of employment with Defendant. This delay, moreover, had no impact upon Plaintiff's pursuit of employment with Defendant. As Plaintiff had called Defendant's office prior to the scheduled interview date of August 8, 1983, he was informed of Defendant's request to interview him during that phone conversation. The inaccurate zip code thus did not impede Plaintiff's ability to interview for the position of staff attorney, which interview took place as scheduled on August 8, 1983.

■ Plaintiff's implicit allegation that he, *alone*, of the pool of potential job applicants was told not to bring additional written materials to the interview is unsupported by any evidence.[5] Plaintiff's belief is also that such restrictions made evaluation of a candidate's qualifications impossible. Again, the Court cannot agree that this constraint raises the inference that Plaintiff's rejection by Defendant was based solely on the basis of his handicap. There is no indication on Plaintiff's resume, which Defendant had kept in its files, of his record of mental illness or his sensory integration dysfunction. (Pridemore deposition, Exh. 2). Nor is there any indication that Defendant otherwise knew of Plaintiff's possible conditions of handicap prior

---

5. Plaintiff recounts his conversation with Roy Martin as follows in his August 14, 1983 memorandum: "Mr. Roy Martin told plaintiff, 'We don't want *you* to bring anything to the interview—no transcripts, no references, no writing samples, no letters of recommendations, nothing.'" (Doc. #23).

to the interview and specifically sought to arrange a *pro forma* interview by instructing Plaintiff not to bring other materials to the interview with him which would further explain or develop his credentials.

Plaintiff admits that his assertion of Martin's knowledge of Plaintiff's threat to bring a handicap discrimination claim against another potential legal aid employer is simply the product of an inference which he (Plaintiff) drew from the structure and timing of his interview with Defendant. Plaintiff acknowledges that he has no specific knowledge that Martin possessed any such information of the threat of such other action against the Dayton Legal Aid Society. (Pridemore deposition, p. 41–43, 93–94, 113). Plaintiff's contention that he has been "unofficially blacklisted by all legal aid programs in Ohio" is, again, conclusory and without other support in the record. (Doc. # 23).

For the reasons aforesaid, the Court concludes that no facts have been put forward or contested which would allow an inference that Defendant's rejection of Plaintiff was based solely on his record of mental illness or perceived learning disability handicap. Thus, even had Plaintiff asserted these handicaps, which he has not, Plaintiff would not have established the necessary genuine issue of material fact susceptible of the inference that he was rejected solely on the basis of his handicap(s). As such, Plaintiff's *prima facie* case would have failed, even had Plaintiff put forward to the Court these conditions, and Defendant would have been entitled to summary judgment.

Having engaged in the lengthy dicta of Part III, as well as having ruled upon the pending motions in this case in Parts I and II, the Court believes the record to have been fully addressed.

The instant case is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.