MURDOCK, Justice.
Debra Mae Foster appeals from a summary judgment entered by the Calhoun Circuit Court in favor of North American Bus Industries, Inc. ("NABI"), in Foster's action alleging retaliatory discharge. We reverse the judgment of the trial court and remand the case.
I. Facts
NABI is a bus manufacturer whose principal production facility is located in Anniston. NABI has what it refers to as a "no-fault, points-based attendance and absenteeism policy." The "Attendance and Absenteeism Policy" ("the policy") organizes reasons for absences into sections, with points accumulated for the type of absence, ranging from 1/4 point to 2 points. An accumulation of six points or more qualifies an employee for "release[ ] from employment automatically." An "absence" is defined as "the failure of employees to be checked in when they are scheduled to work and/or to remain on the job for the entire scheduled shift." Under the section "Absences for the following will have zero (0) points charged" is listed "Job-related injury or illness," along with other reasons such as "Jury Duty" and "Required Military Leave." Under the "1 Point" subsection of the "Point System (values assigned for the described occurrences)" section, the policy states, in part:
"Absence from two or more consecutive full shifts for the same reason if a medical excuse is provided that explains the nature of the illness.
"Absences due to illness or injury to the employee or members of their immediate family (spouse, children) require a medical excuse for verification purposes. The excuse must be presented on the day the employee returns to work or the absences will count (1) point for each day absent.
"Failure to provide adequate medical documentation for each day will result in (1) point for each day missed."
Under the "2 Points" subsection, the policy states: "Absence with no call in. The call must be received at least (30) minutes prior to shift startup. * Note: Absences from two (2) consecutive shifts without proper notification will be considered a voluntary quit without notice." The policy also separately states: "Any absence must be reported at least thirty (30) minutes before scheduled startup. A supervisor or department manager must receive all calls. ... If the supervisor is not available, a message can be left on the appropriate department extension identified by the shift supervisor."
NABI hired Foster as a full-time harness technician on May 29, 2012. Foster worked the day shift, from 6:00 a.m. until 2:00 p.m. or 4:00 p.m. She normally worked Monday through Friday. Foster's immediate supervisor was Tammy Roper, a senior team leader, whose job was to walk the floor to ensure that harness technicians met their quotas. Judy Wright is NABI's Staffing and Benefits Manager, a *72 position in Human Resources ("HR"). According to NABI, Wright's job is to coordinate leave arrangements for employees with non-work-related illnesses or injuries. Also according to NABI, Wright and Roper made the decision to hire Foster, and they were the principal employees involved in the decision to terminate her employment.
As a harness technician, Foster was responsible for putting relay switches, module boxes, and horn switches onto a steel panel. Foster would initially carry the empty steel panel to her station by herself. After she had completed her work on the panel, she would get another employee to help her carry it to a cart. The steel panels Foster worked on weigh about 14 pounds before the installation of switches and modules. After installation, they weigh about 22 pounds.
On Tuesday, July 10, 2012, at around 3:30 p.m., Foster was drilling a screw into a steel panel when the panel flipped forward, knocking off Foster's safety glasses and hitting her in the forehead, causing her to fall back into her chair. Then, according to Foster, "everything got black." No one else witnessed the accident. Because Roper was on vacation that week, Foster first reported the injury to Carol Brasher, whose responsibilities included providing parts, assisting less experienced employees, and being a first responder for workplace injuries. After Foster sat in a chair by Brasher's desk for about 30 minutes, Brasher took her to the office of Debra Hale, NABI's on-site nurse. Among other things, it was Hale's job to coordinate leave and obtain health care for work-related illnesses or injuries. Hale was not in her office, so Brasher and Foster returned to Foster's work station and waited there. Sometime thereafter, Hale came to see Foster.
Hale asked Foster what had happened, and Foster related the details of the accident. Foster informed Hale that she had a headache, and Hale assessed Foster for signs of a concussion. According to Hale, Foster had an abrasion on her right arm, but Foster did not exhibit any signs of serious head trauma. Another employee noted that Foster had a mark on her forehead. Hale told Foster that if she exhibited any further symptoms of headaches or any nausea, she should contact Hale and Hale would send Foster to the hospital for further evaluation.
After Foster's shift ended on July 10, she drove herself home. Later that night Foster began feeling worse and started vomiting. Because of her worsening condition, Foster went to Regional Medical Center ("RMC") in Anniston the following morning instead of showing up for her shift at NABI. Hale then received a telephone call from an RMC employee (Foster had given the employee Hale's telephone number) telling her that Foster was there receiving treatment and claimed that her injuries were the result of a workplace injury. There is a dispute as to what occurred next in the conversation. According to Foster, the RMC employee informed Foster that Hale said that Foster was not injured on the job and therefore that NABI would not pay for her medical care, and Foster told the RMC employee that she wanted to be seen at RMC anyway. According to Hale, she told the RMC employee that NABI used Stringfellow Hospital for emergency visits and that NABI would not pay for Foster to be seen at RMC. Following a CT scan of her head and several other tests, Foster was diagnosed with a concussion, and she was given two shots to help with her pain.
Foster was given a "Work/School Absence Form" from RMC dated Wednesday, July 11, 2012, which stated, in part:
*73 "Please excuse the above-named individual from work/school. They were seen today in the Emergency Department, and should be able to return to work/school in two (2) days from the above date." Foster testified that her husband, Randy Foster, dropped off this doctor's note at the guard station located at the front of the NABI facility with the understanding that the excuse was to be delivered to HR. Randy Foster also testified that he left this doctor's note with the security guards posted at the front of the NABI facility. Hale testified that Foster gave her this doctor's excuse when she returned to work on Monday, July 16.
On Friday, July 13, 2012, Foster went to Oxford Family Practice, her primary-care physician at that time, for further evaluation. At the conclusion of that visit, Foster received a form from her physician stating that she should be excused from work for the dates of July 13 through 15 and that she could return to work on July 16, 2012. The form contained nothing more than the relevant dates and the doctor's signature. Foster testified that this was the excuse she brought in to Hale on July 16. NABI contends that Foster gave this excuse to Roper.
NABI's attendance records show that Foster did not receive any points for her absences from July 11 through July 13, which were her remaining scheduled workdays that week, because she was listed as "Consecutive Days Absence only if medical documentation provided."
Foster returned to work on Monday, July 16, 2012. Roper also returned to work from vacation on that date, and she was informed of Foster's accident. At around 9:30 a.m. that morning, Hale took Foster to Physicians' Care, an approved medical-services provider for NABI employees who had suffered on-the-job injuries, for evaluation. Physicians' Care released Foster for work on the same date, July 16, 2012, and Foster resumed her shift that day.
Foster worked as usual between July 16 and July 18. Foster testified in an affidavit filed after her deposition that, during this period, she and Roper had a conversation in which Roper stated that Foster "might have to find something else." Foster responded: "Are you talking about another job?" Roper replied: "I'm just saying." Roper and NABI deny that this conversation occurred.
On July 18, 2012, Patty Wyatt, one of Foster's coworkers, reported to Roper that Foster was feeling ill and nauseated. Wyatt and Roper went to check on Foster, and Foster reported that she had been throwing up. Roper noted that Foster was breathing heavily. Hale then came to Foster's station, and she took Foster to NABI's on-site doctor. After a while, Foster left work and went to Physicians' Care for treatment around 11:00 a.m.
At 6:45 p.m. on the night of July 18, 2012, Foster returned to RMC complaining of abdominal pain, vomiting, and bloody stools. Foster was admitted to the hospital for further testing. Medical records show that Foster had an emergency CT scan of her head on July 18 but that it did not find any abnormalities to explain her symptoms.
Randy Foster testified that he "personally left a message on Tammy Roper's voicemail on July 19, 2012, and told her that [Foster] was in the hospital and [he] did not know how long she would be in there, but she would be unable to go back to work for a while." He stated that he believed he used the hospital telephone to leave the message and that he placed the call before Foster's shift began. Roper testified that sometime after Foster's shift started she received a telephone call from Foster's husband informing her that Foster *74 had been hospitalized and that Foster would be out for two or three days. An entry in Hale's contemporaneous notes for July 19, 2012 (a Thursday), states: "Debra [Foster] did not come into work. T[ammy] Roper received a phone call that she was in the hospital and would be out for a few days, per Debra's husband." NABI cites Randy Foster's telephone records to relate that he placed a call to Roper from his cellular telephone nearly two hours after Foster was to have started her shift.
Hale telephoned Foster later in the day on July 19. Hale testified that she asked Foster if her hospitalization was related to her work injury, but Foster simply replied that she was on heavy medication and in no condition to talk so she would call her later. Foster testified that Hale told her during this conversation: "If you are in the hospital because of your injury at NABI, I have nothing to say to you!"
Foster was discharged from the hospital on Sunday, July 22, 2012. Foster testified that her husband telephoned Roper on Sunday, July 22, and left a voicemail on her telephone stating that Foster had been released from the hospital but that she would be out of work until the doctor cleared her to return to work. Roper denies receiving any telephone call between July 22 and July 25 accounting for Foster's whereabouts during that period.
Both Foster and Randy Foster testified that, after Foster was discharged from RMC, Randy Foster drove them to the NABI facility to deliver a doctor's note from RMC that excused Foster from working until August 6, 2012. The note stated, in part: "P[atient] was admitted to the hospital 7/19/12 [and] discharged 7/22/12 due to medical reasons. She will need ... leave until Wednesday 8/6/12 when cleared to return to work." Foster and Randy Foster testified that they were unable to go farther than the guard post at the front of the Anniston facility because Foster felt too sick and they did not have a pass to get into the facility. Accordingly, they left the note with the guards, instructing them to give the note to Roper.
Roper denies ever receiving the note. NABI states that leaving medical excuses with the guards, who were not NABI employees, was not proper protocol. NABI also asserts that Foster could have entered the facility and given the note to someone in HR because she had her employee-identification card.
It is undisputed that Foster did not show up for work on July 23 or July 24. Foster testified that she received a telephone call from Judy Wright on July 23 informing her that Foster was going to receive a point on her absence record because she was not at work that day. Wright denies making such a telephone call. On July 25, Foster called Wanda Maddox, another NABI employee with supervisory responsibilities, informing Maddox that she had been released from the hospital.
According to Wright, on July 25 and July 26, she telephoned Foster and left voicemails seeking medical documentation for her work absences on July 23 and July 24. She said that Foster returned her calls on the night of July 26 and complained that Hale had not set up an appointment for neurological testing and indicated that she would "think about" providing medical documentation for her absences. Wright asserts that Foster was angry during the telephone call. Foster denies talking to Wright on July 26, though telephone records appear to establish that Foster made such a call.
NABI terminated Foster's employment on July 30, 2012. Its stated basis for doing so was two consecutive days of absence *75 from work on July 23 and July 24 without calling in before each shift.
Foster continued to be seen by doctors for symptoms related to her head injury. On August 21, 2012, she was seen by Dr. Dalla M. Russell following a referral from Physicians' Care. Dr. Russell's diagnosis note from that date states in part: "Congestion with Post-concussive syndrome of headache, dizziness and nausea."
Foster filed an action alleging retaliatory discharge against NABI in the Calhoun Circuit Court on December 11, 2012, following Foster's initiation of proceedings to recover worker's compensation benefits. On January 23, 2013, NABI answered the complaint and denied the allegations. Following extensive discovery, NABI filed a motion for a summary judgment on November 18, 2015. Foster filed a response in opposition to the summary-judgment motion. In support of that response, Foster filed new affidavits from herself and her husband. On February 1, 2015, NABI filed a reply to Foster's response. Additionally, it filed motions to strike portions of the new affidavits submitted by Foster and her husband, contending that portions of the affidavits contradicted their previous testimony or other record evidence.
On February 19, 2015, the trial court entered an order granting NABI's motion for a summary judgment. The order offered no reasons for the decision, beyond stating that, "[a]fter reviewing all appropriate filings in this case and considering the oral arguments offered by each side at the hearing in this matter, the Court finds there exists no genuine issues of material fact." The trial court did not rule on NABI's motions to strike.
Foster filed a timely notice of appeal.
II. Standard of Review
"We review a summary judgment de novo, seeking to determine whether the evidence presents a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P. If the movant makes a prima facie case that no genuine issue of material fact exists, the burden then shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank, 538 So.2d 794, 798 (Ala. 1989). Evidence is 'substantial' if it is of 'such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). This Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Ford v. Carylon Corp., 937 So.2d 491, 493-94 (Ala. 2006).
III. Analysis
Foster broadly contends that a number of disputed facts preclude the entry of a summary judgment in this retaliatory-discharge action.
"In Alabama Power Co. v. Aldridge, 854 So.2d 554, 563 (Ala. 2002), this Court articulated the following test for determining whether a plaintiff may recover for retaliatory discharge under § 25-5-11.1[, Ala. Code 1975]:[1 ]
*76 " 'In order for an employee to establish a prima facie case of retaliatory discharge the employee must show: (1) an employment relationship, (2) an on-the-job injury, (3) knowledge on the part of the employer of the on-the-job injury, and (4) subsequent termination of the employment based solely upon the employee's on-the-job injury and the filing of a workers' compensation claim.' "
Falls v. JVC America, Inc., 7 So.3d 986, 989 (Ala. 2008).
As is the case with many retaliatory-discharge actions, there is no dispute between the parties about the first three elements; the disagreement arises over whether Foster was terminated because of her on-the-job injury and the filing of a worker's compensation claim. We have established a burden-shifting process in such cases.
" 'We hold that an employee may establish a prima facie case of retaliatory discharge by proving that he was "terminated" because he sought to recover worker's compensation benefits, which would be an impermissible reason. The burden would then shift to the defendant employer to come forward with evidence that the employee was terminated for a legitimate reason, whereupon the employee must prove that the reason given by the employer was not true but a pretext for an otherwise impermissible termination.'
" Twilley [v. Daubert Coated Prods., Inc. ], 536 So.2d [1364,] 1369 [ (Ala. 1988) ]. We note that it would be more appropriate to say that, after the [employer] has met [its] burden of coming forward with evidence of a legitimate reason, ' "[t]he [employee] then has the burden of going forward with rebuttal evidence showing that the [employer's stated] reasons" ' for terminating the [employee] are not true. Twilley, quoting Pushkin v. Regents of the University of Colorado, 658 F.2d 1372, 1387 (10th Cir. 1981). The [employee] does not have to 'prove' that the employer's stated reason is not true unless the [employer's] evidence is sufficiently certain, without more evidence from the [employee], to support a [judgment as a matter of law]. If the [employee's] prima facie case is strong, and the [employer's] evidence of an asserted reason is weak or equivocal, the jury might simply disbelieve the [employer].
"....
"Alabama's worker's compensation laws should be liberally construed in favor of the employee in order to advance and effectuate their beneficent purposes."
Culbreth v. Woodham Plumbing Co., 599 So.2d 1120, 1122-23 (Ala. 1992).
This Court previously has suggested that courts may consider several factors in evaluating whether a plaintiff has established a prima facie case of retaliatory discharge, such as
" '1) knowledge of the compensation claim by those making the decision on termination, 2) expression of a negative attitude toward the employee's injured condition, 3) failure to adhere to established company policy, 4) discriminatory treatment in comparison to similarly situated employees, 5) sudden changes in an employee's work performance evaluations following a workers' compensation claim, and 6) evidence that the stated reason for the discharge was false.'
*77 "... Many states consider '[p]roximity in time between the filing of the workers' compensation claim and discharge....' Rebarchek v. Farmers Coop. Elevator & Mercantile Ass'n, 272 Kan. 546, 555, 35 P.3d 892, 899 (2001)."
Alabama Power Co. v. Aldridge, 854 So.2d 554, 564-65 (Ala. 2002) (quoting Chhim v. University of Houston, 76 S.W.3d 210, 218 (Tex. Ct. App. 2002) ).
Foster notes that she presented evidence of several of the foregoing factors. There was a relatively close proximity between the date on which Foster filed a claim for worker's compensation benefits and the date of her discharge. She was injured on July 10, 2012, and filed her claim for benefits on that date; she was discharged on July 30, 2012. There is no dispute that those who made the decision to terminate Foster's employment, Wright and Roper in particular, knew about Foster's worker's compensation claim. Foster presented evidence (albeit disputed) indicating that Debra Hale expressed a negative attitude about Foster's injured condition. There is also a conflict in the evidence as to whether NABI adhered to the policy in terminating Foster's employment.
Considering the foregoing evidence, we find no difficulty in concluding that Foster presented a prima facie case of retaliatory discharge. Therefore, it was incumbent upon NABI to present evidence indicating that Foster's employment was terminated for a legitimate reason.
NABI contended that it terminated Foster's employment pursuant to the "Attendance and Absenteeism Policy," which it says dictates that an employee is terminated if he or she fails to show up for scheduled work two consecutive days without calling in to a supervisor 30 minutes before his or her shift on each day. Specifically, NABI says Foster was terminated after she was a "no-call, no-show" on July 23 and July 24, 2012. NABI argues that there are no exceptions to this policy, and it presented evidence it says demonstrates that it terminated the employment of 44 employees for violating this same "no call, no show" policy between July 2010 and February 2013.[2]
It is undisputed that Foster herself did not call in to a supervisor and that she did not show up for work on July 23 and July 24, 2012. Because NABI presented evidence of a legitimate reason for terminating Foster's employment, the burden shifted back to Foster to show that the reason given by NABI was not true but was a pretext for an otherwise impermissible termination.
Foster argues that she presented a variety of evidence indicating that NABI's stated basis for terminating her employment was untrue. First, she states that she fulfilled the requirements of the policy because her husband telephoned Roper on July 22, 2012, and left a voicemail informing Roper that Foster would not be coming back to work for at least a few days.
NABI responds that Roper never received such a call. It is true that Randy Foster's telephone records do not show a telephone call to Roper on July 22, 2012, and that Roper sent an e-mail to her colleagues on July 23, 2012, after Foster's shift had started asking if they knew where Foster was. NABI argues that, even if Roper had received such a call, the call did not fulfill the requirement in the policy that Foster had to call in each day at least 30 minutes before her shift began.
*78 NABI's contention that Roper never received Randy Foster's telephone call ignores the fact that Randy Foster testified that he made such a call and the possibility that Randy Foster used the hospital's telephone to do so, as he had done on July 19, which would explain why the records for his cellular telephone did not reflect such a call. Thus, there is a conflict in the evidence on this point that raises a material question of fact.
The problem with NABI's argument that the telephone call described by Foster did not fulfill the policy's call-in requirement is that NABI allowed such a telephone call from Randy Foster to be sufficient on an earlier occasion. It is undisputed that Randy Foster telephoned Roper on July 19, 2012, and that he left a voicemail to inform Roper that Foster was in the hospital and that she would be out of work for at least a few days. NABI did not terminate Foster's employment for her absences from work on July 19 and July 20, 2012, even though, according to Roper and NABI, Randy Foster did not call in on July 19 until after Foster's shift had started and no call was made to Roper on Foster's behalf on July 20. Moreover, it is undisputed that no one called in before Foster's shifts on July 11, 12, or 13, yet Foster was not charged any points for her absences from work on those days because she had delivered medical-excuse notes for those absences either before or after the fact. In other words, the evidence in the record indicates that NABI did not consistently apply the "no-call, no-show" policy in Foster's case, which raises the possibility of pretext.
Foster next observes that, even if Randy Foster had not made the telephone call, she and Randy dropped off a medical-excuse note at the guard station at the front of the Anniston facility on July 22, 2012, that explicitly indicated that she would be unable to return to work until August 6, 2012. Foster argues that this should have been sufficient to fulfill the requirements of the policy because the policy expressly provides that a "[j]ob-related injury or illness" is completely excused. Foster contends that it defies common sense that she would have had to call in each day before her shift beginning on July 23, 2012, when her medical-excuse note explicitly stated that she could not work until August 6, 2012.
NABI offers multiple responses to Foster's contentions about the medical-excuse note dated July 22, 2012. First, it contends that NABI never received the note and that this failure was Foster's fault because she should have and could have delivered the note in person and because the guards posted at the front of the Anniston facility were not NABI employees. Second, NABI contends that, even if NABI personnel had received the medical excuse, the note would not have sufficiently apprised them that Foster's absence was the result of her on-the-job injury. Third, NABI argues that its policy requires employees to call in each day even if an employee has a medical excuse that provides for a multiple-day absence.
Whether Foster's method of delivering the medical-excuse note was sufficient is an issue of fact. Both Foster and Randy Foster testified that Randy delivered a medical-excuse note on July 11, 2012, to the guards posted at the guard station at the front of the Anniston facility, and the evidence appears to indicate that NABI personnel received that excuse because Foster was not charged any points for her absences on July 11 and July 12, 2012. Given this previous experience and the fact that no one appears to have told Foster that such a method of delivery was inappropriate, there remains an issue of fact as to whether Foster's method of delivering *79 the July 22, 2012, medical-excuse note was sufficient.
NABI's contention that the content of the July 22, 2012, medical-excuse note was not sufficient to apprise NABI personnel that Foster's absences on July 23 and July 24 were related to her on-the-job injury rings more hollow than its protest concerning the method of the delivery of the note. NABI argues that "the note's ambiguous message did not reveal the origin of [Foster's] second hospital visit." This is because the note simply stated that Foster was in the hospital for "medical reasons" and that "[s]he will need ... leave until Monday 8/6/12 when she should return to work." One problem with NABI's argument is that NABI accepted as sufficient two previous medical-excuse notes that were at least as vague as the July 22, 2012, note. The first note, dated July 11, 2012, simply stated, in pertinent part: "Please excuse the above-named individual from work/school. They were seen today in the Emergency Department, and should be able to return to work/school in two (2) days from the above date." The second note, dated July 13, 2012, merely provided the relevant dates that Foster should be excused from work and the doctor's signature. Neither note expressly stated what kind of injury prevented Foster from returning to work or that the injury was work-related. Despite these deficiencies, it is undisputed that Foster was not charged any points for her absences from work from July 11 through July 13, and NABI's documentation stated that Foster was "Consecutive Days Absence only if medical documentation provided."
NABI's third rejoinder-that the policy required employees to call in each day even if they submitted a medical excuse that provided for a multiple-day absence-also does not square with NABI's previous practice in this case. As we already noted, it is undisputed that no one called in before Foster's shifts on July 11, 12, or 13, yet Foster was not charged any points for her absences from work on those days because she delivered medical-excuse notes for those absences.
Moreover, NABI's actions after Foster's absences on July 23 and July 24 cast further doubt on whether calling in each day was an unequivocal requirement. Wright testified as follows in her deposition:
"Q. Right. Your note says husband, Debra Foster's husband, calls Tammy Roper to report she had been admitted to the hospital. That wouldn't be good enough to cover anything the 19th?
"A. It would be if she had produced the medical documentation that I asked her for, which she failed to do.
"Q. So you go back, in other words, you do have a procedure for allowing an employee to go back and document it after the fact?
"A. Yes. In a case such as this when the husband had reported that she was in the hospital, you know, we would expect to get documentation to substantiate that, because if you noticed the record there on her attendance with all of the zeros, they're either consecutive days absence or she was absent due to doctor visits or whatever related to the injury that was reported."
Wright also testified that the reason she waited until July 30, 2012, to terminate Foster's employment was to give Foster a chance to submit medical documentation for her absences because she wanted "[j]ust to give that employee the benefit of the doubt as we do with all of our employees, or try to." This indicates that the real issue was not that Foster failed to call in before each shift but, rather, that she allegedly failed to provide adequate medical documentation for her absences after the fact.
*80 In addition to all the foregoing, there is evidence indicating that, even if NABI never actually received the July 22, 2012, medical-excuse note-an issue that, as we have said, is a question of fact-it was aware that Foster's absences on July 23 and July 24 were related to her on-the-job injury. Foster talked to Wanda Maddox on July 25 and told Maddox that she had been released from the hospital. Wright testified that she talked to Foster on July 26 and that Foster expressed anger that Hale had not set up an appointment for Foster to receive neurological testing. NABI personnel also were well aware that Foster had been absent from work frequently since the July 10 accident. These communications and the context suggest, at least, that NABI knew Foster's absences were related to her July 10 accident.
Finally, Foster contends that there is one other compelling piece of evidence that shows that NABI's stated reason for termination of her employment was a pretext. Foster cites the portion of her affidavit she submitted in opposition to NABI's motion for a summary judgment in which she recounted a conversation she had with Roper shortly after her accident in which Roper stated that Foster "might have to find something else." Foster responded: "Are you talking about another job?" Roper replied: "I'm just saying." Foster argues that this conversation indicated that NABI did not want to employ Foster following her on-the-job injury.
NABI disputes this evidence by contending that Foster's testimony about this conversation directly contradicted testimony she provided in her deposition. NABI quotes Enoch v. Firestone Tire & Rubber Co., 534 So.2d 266, 269 (Ala. 1988), for the proposition that "on a motion for summary judgment, a party may not create an issue of fact 'with an affidavit that merely contradicts without explanation, previously clear testimony.' " (Quoting Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984).) This argument was a basis of NABI's motion in the trial court to strike portions of Foster's affidavit, which motion was not granted.
We first note, however, that evidence of the conversation Foster recounted in the affidavit was present in the record before the taking of her deposition and the submission of Foster's post-deposition affidavit. Included in NABI's submissions in support of its motion for a summary judgment were handwritten contemporaneous notes Foster made concerning her interactions with NABI personnel pertaining to her on-the-job injury. One of those notes recounted the conversation Foster alleges she had with Roper shortly after her accident. NABI did not question Foster about this note in her deposition.
Moreover, as Foster also argues, the portion of her deposition NABI cites as "contradicting" her affidavit testimony does not do so in the manner contemplated by the cited proposition. The testimony consists merely of the following colloquy:
"Q. Ok. Has anyone at NABI ever expressed any hostility for making a Worker's Comp. claim?
"A. Not that I recall.
"Q. Have you ever heard anybody at NABI say anything negative about any other employees because they filed a Worker's Comp claim?
"A. Not that I recall."
The conversation between Roper and Foster does not necessarily indicate that Roper had "hostility" toward Foster for filing of a worker's compensation claim or that Foster must have understood the conversation in this manner. It does shows at least that Roper thought Foster's injured status would make it difficult for NABI to continue to employ her. But the conversation does not directly "contradict[,] without *81 explanation, previously clear testimony." Enoch, 534 So.2d at 269. In any event, as already noted, evidence of the conversation is present in the record even without Foster's affidavit.
NABI disputes that the conversation between Roper and Foster highlighted in Foster's affidavit ever occurred, and it argues that the affidavit contradicts Foster's previous testimony in that regard, but NABI does not dispute that such a conversation, if it occurred, is damaging to its assertion that there is no evidence of a pretextual termination of employment. Once again, the evidence of the conversation raises questions of fact as to whether the conversation occurred, what its meaning was if it did occur, and whether it sufficiently demonstrates that NABI's stated reason for terminating Foster's employment was untrue. The answers to such questions require a jury determination.[3]
IV. Conclusion
Based on the foregoing, we conclude that numerous issues of fact preclude the entry of a summary judgment in this case. More specifically, Foster introduced sufficient rebuttal evidence in support of her position that NABI's stated reason for terminating Foster's employment was a pretext so as to create a genuine issue of material fact. Accordingly, the judgment of the trial court is reversed and the cause is remanded for further proceedings.
REVERSED AND REMANDED.
Stuart, C.J., and Bolin, Main, and Bryan, JJ., concur.

Section 25-5-11.1 provides:
"No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter or solely because the employee has filed a written notice of violation of a safety rule pursuant to subdivision (c)(4) of Section 25-5-11."

It is worth noting that the vast majority of the listed 44 employees were temporary workers.

NABI has filed a motion requesting permission to file a surreply brief in an effort to focus this Court's attention on certain parts of the record that NABI contends conflict with factual assertions made by Foster in her reply brief. Having reviewed the entirety of the record, including the portions that are the subject of NABI's motion, and seeing no need for additional briefing, this Court by separate order is denying NABI's motion.